**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **AMERICAN FAMILY MUTUAL** | ) | |
| **INSURANCE COMPANY, S.I. f/k/a** | ) | |
| **AMERICAN FAMILY MUTUAL** | ) | |
| **INSURANCE COMPANY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CASE NO. 1:24-cv-00506-MPB-MJD** |
| | ) | |
| **WYNDHAM HOTELS &** | ) | |
| **RESORTS INC.,** | ) | |
| **AKSHAR KRUPA INDIANA,** | ) | |
| **L.L.C. d/b/a SUPER 8 MOTEL, and** | ) | |
| **G.M., an individual** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| | ) | |
| **SUPER 8 WORLDWIDE, INC.,** | ) | |
| **Counterclaim Plaintiff** | ) | |
| **WYNDHAM HOTELS &** | ) | |
| **RESORTS INC.,** | ) | |
| **AKSHAR KRUPA INDIANA,** | ) | |
| **L.L.C. d/b/a SUPER 8 MOTEL, and** | ) | |
| **G.M., an individual** | ) | |
| | ) | |
| **Counterclaimants,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **AMERICAN FAMILY MUTUAL** | ) | |
| **INSURANCE COMPANY, S.I. f/k/a** | ) | |
| **AMERICAN FAMILY MUTUAL** | ) | |
| **INSURANCE COMPANY** | ) | |
| | ) | |
| **Counterclaim Defendant.** | ) | |

## AMERICAN FAMILY'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS WYNDHAM AND SPI'S COUNTERCLAIM

In requesting that the Court order American Family[1] to provide coverage in connection with a child sexual trafficking lawsuit, the Counterclaimants[2] ask the Court to take a remarkable position. Specifically, they ask the Court to conclude that a party is entitled to insurance coverage for allegedly profiting from child sexual trafficking. Not only would reaching this requested conclusion require the Court to ignore public policy and the language of implicated insurance policy, it would also effectively embrace the use of insurance to protect profits earned from alleged child sexual trafficking. The Court should not take this remarkable position. As a matter of law, the Court should dismiss the Counterclaim (Dkt. 69) with prejudice.

## I.    FACTUAL BACKGROUND[3]

This lawsuit addresses whether American Family must provide any coverage in connection with a child sexual trafficking lawsuit filed against Wyndham. *See* Dkt. 69; *see also* Dkt. 35; Dkt. 35-1; Dkt. 35-2.[4]

## A.    The Underlying Lawsuit

In the Southern District of Ohio, G.M. filed a child sexual trafficking lawsuit against Wyndham (and other defendants), alleging that Wyndham bears liability in connection with child

---

[1] Plaintiff/Counterclaim Defendant American Family Mutual Insurance Company S.I. f/k/a American Family Mutual Insurance Company is referred to herein as "American Family."

[2] For purposes of this Brief, the term "Counterclaimants" refers to, collectively, Wyndham Hotels & Resorts, Inc. ("Wyndham") and Super 8 Worldwide, Inc. ("SPI"). And the term "Counterclaim" refers to the Counterclaim Against American Family filed by the Counterclaimants (Dkt. 69).

[3] Under Rule 12(b)(6), a court accepts the pleading party's well-pleaded allegations as true and draws all reasonable inferences in that party's favor. *Thompson v. Ill. Dep't of Pro. Regul.*, 300 F.3d 750, 753 (7th Cir. 2002).

[4] Note, the Counterclaim expressly references and relies upon the exhibits attached to the Amended Complaint, including the policy (Dkt. 35-2) and the underlying complaint (Dkt. 35-1), and those exhibits are central to the issues raised by the Amended Complaint and the Counterclaim. Accordingly, the Court may consider those exhibits in deciding this Motion. *See* Dkt. 69; *see also, e.g. Content & Commerce, Inc. v. Chandler,* No. 1:20-cv-02488-JMS-DLP, 2021 WL 2634605, at *3 n. 2 (S.D. Ind. June 25, 2021).

sexual trafficking conducted between August and October 2016 at the Super 8 motel located at 4033 E Southport Road in Indianapolis (the "Motel") (the "Underlying Lawsuit").[5] [6]  Dkt. 69 at 30-31, ¶¶ 19-28; Dkt. 35-1.  Through the Underlying Lawsuit, G.M. seeks various damages and relief from Wyndham, including punitive damages.  Dkt. 69 at 30, ¶ 20; Dkt. 35-1.  While the Underlying Lawsuit includes claims against other defendants, the Underlying Lawsuit does not include any claims against Akshar Krupa Indiana, L.L.C. d/b/a Super 8 Motel ("Krupa") or SPI.  Dkt. 35-1.

**B.**    **Policy**

    American Family issued a businessowners insurance policy to Krupa, with effective dates including August and October 2016 (the "Policy").  Dkt 69 at 32, ¶¶ 35-36; Dkt. 35-2.  The Policy sets forth the circumstances under which it will provide coverage.  Dkt. 35-2.  Like most insurance policies, the Policy does not require American Family to provide coverage in connection with every lawsuit against every insured.  *Id*.  Rather, the Policy only requires American Family to provide coverage under certain circumstances.  *Id*.  Among other things, American Family has no duty to defend an insured against any suit to which the Policy does not apply.  *Id*. at 34.

**C.**    **This Lawsuit**

    After being named as a defendant in the Underlying Lawsuit, Wyndham sought coverage from American Family for the Underlying Lawsuit (as an additional insured under the Policy).  Dkt. 69 at 36, ¶ 68.  Although American Family has defended Wyndham under a reservation of rights, American Family has identified multiple reasons why the Policy does not provide coverage in

---

[5] For purposes of clarity, the Underlying Lawsuit is styled *G.M. v. Choice Hotels International, Inc.*, Case No. 2:22-cv-03788-ALM-EPD and is currently pending in the United States District Court for the Southern District of Ohio.  *See* Dkt. 35-1.

[6] Throughout this Brief, American Family refers to G.M.'s allegations asserted in the Underlying Lawsuit.  American Family acknowledges these allegations may be unproven, untrue, and/or otherwise without merit, but at this stage, American Family generally accepts them as true for purposes of determining its coverage obligations.

connection with the Underlying Lawsuit. Dkt. 69 at 36, ¶¶ 69-70. Thus, American Family filed this lawsuit regarding its coverage obligations. Dkt. 69 at 36, ¶ 70; *see also* Dkt. 1; Dkt. 35.

**D.     The Counterclaims**

In addition to answering American Family's Amended Complaint, Wyndham and Krupa asserted Counterclaims against American Family. Dkt. 69; Dkt. 70. Both assert five counts against American Family—all of which generally relate to whether American Family must provide coverage to Wyndham in connection with the Underlying Lawsuit. Dkt. 69 at 38- 44, ¶¶ 78-127; Dkt. 70 at 36-43, ¶¶ 65-113. Although SPI was not named as a defendant in the Underlying Lawsuit or this lawsuit, it joined in Wyndham's Counterclaim against American Family, generally seeking the same relief as Wyndham. Dkt. 69.

## II.     LEGAL STANDARD

**A.     Rule 12(b)(6) Standard**

American Family seeks dismissal of the Counterclaim under Rule 12(b)(6). Thus, this Motion tests the legal sufficiency of the Counterclaim. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). It does not, however, test the merits of the case. *Id*.[7]

Ultimately, "Rule 12(b)(6) will be invoked to dismiss a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the [counterclaim]." *Hampton v. Perry*, No. 1:20-cv-00759-TWP-MPB, 2020 WL 4430586, at *1 (S.D. Ind. July 31, 2020); *see also Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 881-82 (7th Cir. 2022). In other words, to survive a motion to dismiss under Rule 12(b)(6), the non-moving party needs to assert factual allegations that "raise a right to relief above the speculative level" on the

---

[7] *See also Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc*., 250 F.3d 570, 574 (7th Cir. 2001) (legal standard to dismiss counterclaim under Rule 12(b)(6) is the same as for a motion to dismiss a complaint).

assumption that all the allegations are true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Hampton*, 2020 WL 4430586, at \*2.

**B.    Insurance Standards**

While the duty to defend may be broad under Indiana law, it is not boundless. *West Bend Mut. Ins. Co. v. U.S. Fidelity & Guar. Co.*, 598 F.3d 918, 922 (7th Cir. 2010). Where the underlying lawsuit asserts only claims that fall outside the risks covered by a policy, an insurer may properly refuse to defend an insured in an underlying lawsuit. *Id.* In other words, "when the underlying factual basis of the complaint, even if proved true, would not result in liability under the insurance policy, the insurance company can properly refuse to defend." *Jim Barna Log Sys. Midwest, Inc. v. Gen. Cas. Ins. Co. of Wisc.*, 791 N.E.2d 816, 823 (Ind. Ct. App. 2003) (quoting *Cincinnati Ins. Co. v. Mallon*, 409 N.E.2d 1100, 1105 (Ind. Ct. App. 1980)). Thus, an insurer may deny coverage because (among other things) the allegations do not trigger coverage under the implicated policy in the first instance or because an exclusion or other term in the policy precludes coverage. *West Bend*, 598 F.3d at 922; *Aluminum Trailer Co. v. Westchester Fire Ins. Co.*, 522 F. Supp. 3d 464, 469 (N.D. Ind. 2021).

Since the duty to defend is broader than the duty to indemnify, where an insurer does not owe a duty to duty defend its insured, it does not owe a duty to indemnify the insured either. *Allstate Ins. Co. v. Preferred Fin. Sols., Inc.*, 8 F. Supp. 3d 1039, 1043 (S.D. Ind. 2014). In that case, a court may determine an insurer is not obligated to defend or indemnify its insured even before the underlying lawsuit concludes. *Id.* at 1054; *Lightning Rod Mut. Ins. Co. v. Bagshaw*, No. 4:18-cv-00216-RLY-DML, 2021 WL 11963037, at \*5 (S.D. Ind. Mar. 16, 2021).

### III.    ARGUMENT

As a matter of law, the Counterclaim fails to state a claim against American Family for at least two reasons.  First, public policy bars insurance coverage for the claims asserted in the Underlying Lawsuit.  Second, the Policy's terms preclude the coverage sought in connection with the Underlying Lawsuit.  While additional reasons similarly dictate that the Counterclaim must fail (for instance, the parties dispute the specific status of certain defendants as "insureds" under the Policy), the Court need not address those matters now.  Rather, at this stage, the Court can dismiss the Counterclaim with prejudice based upon either argument set forth in this Brief.

**A.    Public Policy Bars Coverage**

The Court should dismiss the Counterclaim with prejudice because public policy bars coverage for the Underlying Lawsuit.  Established Indiana public policy precludes coverage for those who allegedly participated in, and profited from, child sexual trafficking.  Any other result would threaten the morals and safety of the public.

1.    Public Policy Can Preclude Insurance Coverage Under Indiana Law

For decades, Indiana courts have recognized public policy may preclude insurance coverage for certain conduct and claims.  *See, e.g.*, *Stevenson v. Hamilton Mut. Ins. Co.*, 672 N.E.2d 467, 471-72 (Ind. Ct. App. 1996); *Am. Econ. Ins. Co. v. Liggett*, 426 N.E.2d 136, 140 (Ind. Ct. App. 1981); *Town of Orland v. Nat. Fire & Cas. Co.*, 726 N.E.2d 364, 371-72 (Ind. Ct. App. 2000); *Exec. Builders, Inc. v. Motorists Ins. Cos.*, No. IP 00-0018-C-T/G, 2001 WL 548391, at *5 (S.D. Ind. Mar. 30, 2001).

Indeed, despite the presumption often applied, not every contract term is enforceable in every circumstance.  *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1130 (Ind. 1995).  Rather, Indiana "courts have refused to enforce private agreements that [(1)] contravene statute, [(2)] clearly tend to injure the public in some way, or [(3)] are otherwise contrary to the declared public policy of Indiana." *Id.*

Specifically, Indiana courts have ruled agreements contrary to public policy are void and unenforceable. *See, e.g.*, *Straub v. B.M.T. by Todd*, 645 N.E.2d 597, 601 (Ind. 1994) (where sexual intercourse was consideration for contract, contract was "void and unenforceable" because it was "against public policy").

In determining whether to enforce a contract that may violate public policy, courts often consider: (i) "the nature of the subject matter of the contract"; (ii) "the strength of the public policy underlying the statute"; (iii) "the likelihood that refusal to enforce the bargain or term will further that policy"; (iv) "how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain"; and (v) "the parties' relative bargaining power and freedom to contract." *Fazli*, 650 N.E.2d at 1130 (internal citations omitted). And determining whether the public policy exists in Indiana generally requires evaluating Indiana's "[c]onstitution, its statutes, the practice of its officers in the course of administration, and the decisions of its court of last resort." *WellPoint, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 N.E.3d 716, 724 (Ind. 2015) (cleaned up).

Since Indiana treats insurance policies like other contracts, insurance coverages that violate public policy have been deemed unenforceable too. *See, e.g.*, *Stevenson*, 672 N.E.2d at 471-72. In fact, insurance provisions may be unenforceable with respect to specific conduct as a result of public policy even where the insurance policy itself does not expressly preclude coverage for the implicated conduct.[8] For instance, Indiana courts have noted that public policy may preclude insurance coverage for certain moral hazards. The court in *Town of Orland* explained, "public policy demands that a person not be permitted to insure against harms he may intentionally cause others." 726 N.E.2d

---

[8] *See, e.g.*, *Wood v. Allstate Ins. Co.*, 21 F.3d 741, 742 (7th Cir. 1994) (explaining that Indiana law would imply exclusion "as a matter of public policy" even if policy "lacked such a provision"); *Thompson Hardwoods, Inc. v. Transp. Co.*, No. NA 0074CHK, 2002 WL 440222, at *7 (S.D. Ind. Mar. 15, 2002); *Iemma v. Adventure RV Rentals, Inc.*, 632 N.E.2d 1178, 1182-83 (Ind. Ct. App. 1994) ("'Implied exceptions' are those exceptions which are not expressly written into insurance contracts but which have been created to deny coverage where public policy concerns mandate such a result . . . .").

at 371-72.  In *Thompson Hardwoods*, the court likewise remarked, "the common law of Indiana imposes some limits on insurance coverage for such moral hazards as allowing an insured to collect for a loss the insured has intentionally caused." 2002 WL 440222, at *7.  The *Stevenson* court cited a similar pronouncement: "Courts have clearly and repeatedly affirmed the general proposition that public policy prohibits the use of insurance to provide indemnification for civil tort liability that results from an insured's intentional wrongdoing." 672 N.E.2d at 472 (quoting R.E. Keeton & A.I. Widiss, *Insurance Law* § 5.4(d)(1) (1988)).

This approach—preventing insureds from benefiting, even indirectly, from engaging in moral hazards by precluding insurance coverage for that conduct—serves multiple purposes. Among other things, it deters the wrongful conduct and prevents insureds from shifting the consequences of the wrongful conduct to a third party.  *See Iemma*, 632 N.E.2d at 1183-84, n. 2.  If the insured could retain the proceeds of its wrongful conduct by shifting the resulting liability to its insurer, the insured would effectively obtain "a license to engage in such activity." *Town of Orland*, 726 N.E.2d at 371-72.

Given these goals, public policy can preclude insurance coverage even where an innocent party might ultimately benefit from the insured obtaining insurance coverage.  *See id.*  That is, even in cases where a third-party claimant stands to recover the ultimate proceeds of any insurance coverage, public policy still may preclude coverage based upon the nature of the conduct giving rise to the claim.  Even there, allowing the insured to obtain coverage for its conduct would indirectly benefit the insured, giving it a "license" to participate in the harmful conduct.  *Id*.

   2.   <u>Indiana Has A Public Policy Against Human & Sexual Trafficking</u>

Through its statutes, the practices of its officers in the course of administration, and the decisions of its courts of last resort, Indiana has expressed and established a public policy against human and sexual trafficking—particularly of children.  Among other things, it seeks to prevent

human and sexual trafficking and the profiting from that conduct.  Permitting insurance coverage for such conduct would support conduct that infringes on the morals and safety of the public.

For more than fifteen years, Indiana has relied on ever-expanding human and sexual trafficking statutes to further its public policy.  In 2007, Indiana responded to a human trafficking event by making its first human and sexual trafficking statutes effective.  *See, e.g.*, Ind. Code § 35-42-3.5-1 (2007).  Among other things, those statutes criminalized promotion of human and sexual trafficking.  *Id.*  The statutes also required courts to provide restitution to victims.  *Id.* § 35-42-3.5-2 (2007).

Since 2007, Indiana has amended its human and sexual trafficking laws on multiple occasions—each amendment further confirming Indiana's strong public policy against human and sexual trafficking.  For instance, in 2012, Indiana lawmakers strengthened the laws by passing additional human trafficking legislation that expanded the list of punishable offenses (among other things).  *See, e.g.*, *id.* § 35-42-3.5-1 (2012).  Today, Indiana's human trafficking laws criminalize even broader human and sexual trafficking-related conduct.  *See id.* §§ 35-42-3.5-0.5 to -5 (2024).  Not surprisingly, Indiana's public policy against human and sexual trafficking is particularly pronounced with respect to the trafficking of children.  *See id.* § 35-42-3.5-1.3.

Further, the statutory support for Indiana's established public policy extends beyond the "Human and Sexual Trafficking" section of the Indiana Code.  For instance, Indiana Code Section 34-24-1-1(a)(17) allows for the seizure of real and personal property used by a person to "facilitate . . . the commission" of a violation of human trafficking under Indiana's statutes.  Likewise, Indiana Code Section 5-2-1-9(a)(13) requires the establishment of minimum standards for a law enforcement course covering human and sexual trafficking.  Last year, Indiana enacted legislation requiring new commercial drivers to watch an instructional video regarding how to recognize, prevent, and report human trafficking.  *Id.* § 9-24-6.1-2.5.

Evidence of Indiana's public policy against human and sexual trafficking is not limited to its statutory scheme. Among other things, Indiana courts have recognized that Indiana has implemented statewide human trafficking task force: the Indiana Protection for Abused and Trafficked Humans. *Scott v. State*, 162 N.E.3d 578, 582 (Ind. Ct. App. 2021).

For their part, Indiana courts have also supported the public policy against human and sexual trafficking by enforcing the human and sexual trafficking statutes. *See, e.g.*, *Williams v. State*, 204 N.E.3d 279, 281 (Ind. Ct. App. 2023) (affirming conviction for Level 3 felony promotion of child sexual trafficking); *Van Auken v. State*, 233 N.E.3d 1042, 1052-55 (Ind. Ct. App. 2024) (affirming conviction for Level 3 felony promotion of sexual trafficking of a younger child and aggregate 69-year sentence). For more than a century, courts have also emphasized the more general rule that defendants should not be permitted to benefit, even indirectly, from unlawful conduct. *See, e.g.*, *Mount v. Bd. of Comm'rs of Montgomery Cnty.*, 80 N.E. 629, 631 (Ind. 1907) ("To hold otherwise would be to afford an indirect incentive to the doing of the very acts of evil which the law-making power was seeking to suppress.").

Separately and in combination, Indiana's statutes, the practices of its officers in the course of administration, and the decisions of its courts of last resort evidence a strong and expanding public policy against human and sexual trafficking. Not only does Indiana criminalize conduct involving human and sexual trafficking, it also prevents parties from benefitting (financially or otherwise) from such conduct.

3.    The Underlying Lawsuit Asserts Claims For Human & Sexual Trafficking

In the Underlying Lawsuit, G.M. asserts Wyndham participated in, and knowingly benefited from, the sexual trafficking of a child. Dkt. 35-1. In sum, the factual and legal predicate of G.M.'s claim is that, in the face of overwhelming evidence of the trafficking scheme, Wyndham knowingly benefited from its participation in a venture that involved a child being "repeatedly raped and

otherwise sexually abused thousands and thousands of times" at the Motel. *Id.* at ¶ 86; *see generally id.*

Throughout her nearly 50-page Complaint, G.M. identifies examples of alleged conduct Wyndham undertook as part of the alleged sexual trafficking venture—actions which allegedly allowed Wyndham to "knowingly" profit from the venture. *See, e.g.*, *id.* at ¶¶ 81-87, 122, 129, 170-71. Her Complaint leaves no doubt as to her assertions regarding Wyndham's active role in the alleged trafficking, as it includes multiple allegations regarding Wyndham's conduct and an entire section explaining how Wyndham "facilitated the trafficking of G.M." *See, e.g.*, *id*. at ¶¶ 55-56, 81-87, 122, 129, 118-30, 170-71. And according to G.M., Wyndham "failed to take any steps" sufficient "to stop reaping the benefits of sexual exploitation." *Id*. at ¶ 129. To the opposite, G.M. asserts Wyndham ignored "open," "obvious," and "consistent red flags" and "maintained [its] deficiencies to maximize profits." *Id*. at ¶¶ 85, 87, 129. The only counts G.M. asserts in her Complaint are brought under the TVPRA and CAVRA—statutes designed to protect trafficking and child abuse victims. *Id*. at ¶¶ 168-181; *see also* 18 U.S.C. § 1595; 18 U.S.C. § 2255.

    4.   <u>Public Policy Precludes Coverage For The Underlying Lawsuit</u>

Simply put, Indiana does not allow insureds to profit from child sexual trafficking. As a result, neither Counterclaim states a claim upon which relief can be granted against American Family. While the Counterclaim asserts various counts asking the Court to rule that American Family must provide coverage in connection with the Underlying Lawsuit, public policy precludes American Family from doing so.

At bottom, given Indiana's public policy and Wyndham's alleged conduct, the Policy cannot provide coverage in connection with the Underlying Lawsuit. Requiring American Family to provide coverage where a party allegedly benefited from participation in child sexual trafficking would wholly undermine Indiana's public policy. It would allow Wyndham to shift the

consequences and costs of its alleged conduct to American Family—meaning Wyndham could profit from its alleged participation in a child sexual trafficking venture.  Indiana does not permit human and sexual trafficking in the first instance, let alone profiting from it.

Moreover, requiring American Family to provide coverage would not deter any party from facilitating child sexual trafficking.  Just the opposite—it would effectively countenance such conduct by allowing an insured to profit from the conduct and shifting potential costs to the insurer.  As one court has already noted under similar circumstances, such a result would be "against the safety, morals, and welfare of the [state]." *Samsung Fire & Marine Ins. Co., Ltd. (U.S. Branch) v. UFVS Mgmt. Co.*, No. 18-04365, 2023 WL 2574971, at *8 (E.D. Pa. Mar. 20, 2023), *appeal docketed*, No. 23-1988 (3d Cir. June 1, 2023).  The moral hazard associated with relieving an insured defendant of financial responsibility for participating in the alleged sexual trafficking of minors is significant.

Conversely, *barring* coverage for the claims would have the opposite effect.  It would require entities to conduct their business in a way that furthers public policy by seeking to prevent human and sexual trafficking.  Tellingly, G.M.'s Complaint alleges that if Wyndham had paid more attention to the multiple "red flags" and acted "properly," it could have prevented G.M. from being "raped and otherwise sexually abused thousands and thousands of times" at the Motel.  Dkt. 35-1 at ¶¶ 13, 85-87, 125, 129.

Under similar circumstances, other courts have determined public policy precludes coverage for claims arising out of sexual trafficking—even where the claims are not asserted against the traffickers themselves. *See, e.g.*, *Samsung*, 2023 WL 2574971, at *7-8; *Nautilus Ins. Co. v. Motel Mgmt. Servs., Inc.*, 320 F. Supp. 3d 636, 643 (E.D. Pa. 2018) (holding that "public policy precludes coverage" for human trafficking claims), *aff'd on other grounds*, 781 F. App'x 57 (3d Cir. 2019); *Nautilus Ins. Co. v. Motel Mgmt. Servs., Inc.*, No. 20-289, 2021 WL 3164292, at *5 n.4 (E.D. Pa.

July 27, 2021) (explaining that because amended complaint sought damages for facilitation of child sexual trafficking, "public policy reasoning continues to apply" to preclude coverage), *aff'd on other grounds*, 2022 WL 15722613 (3d Cir. 2022); *Nautilus Ins. Co. v. Motel Mgmt. Servs., Inc.*, No. 20-1607, 2021 WL 4123915, at *3 n.31 (E.D. Pa. Sep. 9, 2021) ("The Court also agrees . . . that insurance coverage would be against public policy."), *aff'd on other grounds*, 2022 WL 15722613 (3d Cir. 2022).

Notably, public policy may bar coverage even where the party seeking coverage has not been convicted of a human or sexual trafficking crime. In *Nautilus I*, for instance, the plaintiff claimed she was sexually trafficked in a motel owned and operated by the defendant and asserted a variety of claims (including negligence and emotional distress claims) against the defendant. 320 F. Supp. 3d at 638-39. In the coverage action, the court held public policy precluded insurance for the plaintiff's claims even though the defendant had never been convicted of a crime related to the trafficking. *Id*. at 643; *see also Rosenberg v. Hudson Ins. Co*., 638 F. Supp. 3d 510, 522 (W.D. Pa. 2022) (explaining that "[a] criminal conviction is not required to deny coverage on public policy grounds" and noting *Nautilus I* held "no duty to defend allegations of sex trafficking even though insureds were not criminally convicted"), *appeal docketed*, No. 22-3275 (3d Cir. Dec. 8, 2022); *Town of Orland*, 726 N.E.2d at 371-72 (explaining public policy could bar coverage even where abuse of process claim had not been decided against insured).

In any event, G.M. alleges Wyndham engaged in the type of conduct Indiana seeks to deter. In the first count of her two-count Complaint, G.M. expressly claims Wyndham "**facilitat[ed] violations of the TVPRA through [its] participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion**." Dkt. 35-1 at ¶ 170 (emphasis added). Similarly, in the second, G.M. expressly claims Wyndham "**knowingly recruited, enticed, harbored, transported, provided,**

**obtained, advertised, maintained, patronized, and/or solicited [G.M.]** . . . ." *Id.* at ¶ 179 (emphasis added). That is, G.M. does not seek to hold Wyndham liable for the conduct of the traffickers; she seeks to hold Wyndham liable for its own responsibilities and conduct relating to the alleged trafficking. *See generally* Dkt. 35-1; *id.* at ¶ 9. If G.M.'s allegations are true, Wyndham knowingly benefited from its participation in the sexual trafficking of a child. *See generally id.*

Ultimately, this case presents allegations for which public policy bars insurance coverage in Indiana. Participating in, and profiting from, child sexual trafficking is precisely the type of moral hazard for which Indiana public policy precludes coverage. Furthermore, permitting insurance coverage would do nothing to dissuade child sexual trafficking. Since the essence of G.M.'s claims is that Wyndham knowingly profited from participation in a child sex venture, coverage cannot exist for the Underlying Lawsuit. As there is no circumstance under which any party could be entitled to coverage for the Underlying Lawsuit that would be consistent with Indiana public policy, the Court should dismiss the Counterclaim with prejudice.

**B.      The Policy Language Does Not Provide, And Expressly Precludes, Coverage**

Since public policy bars the coverage sought from American Family, the Court need not consider whether other bases exist to dismiss the Counterclaim. But even if public policy did not bar coverage, the Policy's provisions similarly preclude coverage in connection with the Underlying Lawsuit.

    1.    <u>The Policy Does Not Provide Coverage Because The Abuse Or Molestation Exclusion Bars Coverage</u>

The Policy's "Abuse or Molestation" Exclusion applies to preclude the coverage sought in connection with the Underlying Lawsuit.

In part, the Policy's "Abuse or Molestation" Exclusion Endorsement states that the insurance "does not apply to 'bodily injury' . . . or 'personal and advertising injury' arising out of: (a) [t]he

actual or threatened abuse or molestation **by anyone** of any person while in the care, custody, or control of **any insured**." Dkt. 35-2 at 54 (emphases added).  The Exclusion also bars coverage for the negligent employment, investigation, supervision, reporting to the proper authorities (or failure to so report), or retention of a person "for whom any insured is or ever was legally responsible and whose conduct would be excluded by" the first provision of the Exclusion.  *Id.*

The Indiana Supreme Court's ruling in *Holiday Hospitality Franchising, Inc. v. Amco Insurance Company* explains how Indiana applies this type of exclusion in the face of similar allegations.  983 N.E.2d 574 (Ind. 2013).  There, the underlying action alleged a motel franchisee/operator's employee molested a minor at the motel.  *Id.* at 576.  The minor's family asserted various claims against the motel owner, operator, and franchisor (among others), all under theories of agency and vicarious liability.  *Id.*  When the defendants in the underlying action sought coverage from their insurer, the insurer responded that the policy's "abuse or molestation" exclusion barred coverage.  *Id.* at 576-78.  Notably, the implicated policy's "abuse or molestation" exclusion substantively mirrors the "Abuse or Molestation" Exclusion in American Family's Policy.  *Id.* at 581; Dkt. 35-2 at 54.

After reviewing the facts giving rise to the allegations, the Indiana Supreme Court found the "abuse or molestation" exclusion barred coverage and affirmed the insurer's denial. *Holiday Hosp.*, 983 N.E.2d at 581.  As the court explained first: "We think it obvious that the plain and ordinary meaning of the abuse/molestation exclusion as a whole is that both parties intended to exclude from coverage those claims arising from conduct like [the motel's employee's]." *Id.* at 578.  While the court noted the exclusion "is limited to acts occurring when the victim is in the 'care, custody, or control' of an insured," the court found the victim *was* in an insured's care, custody, or control at the time of the alleged abuse.  *Id.* at 578-81.  Specifically, the court concluded that—"as a matter of law" and at a minimum—the minor was in the "care" of the motel operator.  *Id.* at 580.  Among

other things, the victim was molested in a room rented at the motel. *Id.* Because of the victim's status as a guest, the operator "owed him a duty of care by law." *Id.* (footnote omitted). And since the exclusion barred coverage if the victim was in the care of "any insured," it applied to all underlying claims against all defendants (including the franchisor). *Id.* at 580-81.

Offering further support for its holding, the court acknowledged the facts giving rise to the underlying case "reflect[ed] precisely the sort of scenario contemplated by the parties to be excluded from coverage when they agreed to the insurance contract." *Id.* at 581. If the underlying case did not fit within the scope of the exclusion, the court "would struggle to imagine what reasonably could and still remain within the confines of an ordinary motel business." *Id.* (footnote omitted).

So too here. G.M.'s alleged injuries arise out of her alleged abuse or molestation. Dkt. 35-1. Krupa is an "insured" under the Policy, and G.M. was allegedly abused while she was—as a "matter of law" and at a minimum—in the "care, custody, or control" of Krupa. Dkt. 35-2; *Holiday Hosp.*, 983 N.E.2d at 580-81.[9]

According to the Counterclaim, Krupa owned and operated the Motel. Dkt. 69 at 31, ¶ 30. And the Underlying Complaint includes multiple allegations demonstrating G.M.'s status as a guest in the "care, custody, or control" of Krupa at the Motel while she allegedly was "raped" and "otherwise sexually abused" "thousands and thousands of times." Dkt. 35-1 at ¶¶ 5, 48, 51, 81-87. Indeed, G.M. makes clear that her alleged abuse and molestation occurred in rooms rented at the Motel for a period of ***three months***. *Id.* Those rooms were purportedly rented and paid for at the Motel. *Id.* And employees and personnel at the Motel reportedly interacted and responded to requests involving G.M. during her stay as a guest at the Motel. *Id.* at ¶¶ 81-87. Among other things, G.M. indicates that they handled room location requests, linen change requests, and do not

---

[9] Additionally, G.M. may have also been in the "care, custody, or control" of other insureds under the Policy. However, the Court need not decide that issue now to dismiss the Counterclaim with prejudice.

disturb requests while G.M. was a guest at the Motel. *Id.* Under *Holiday Hospitality*, G.M. was in the "care, custody, or control" of Krupa "as a matter of law." 983 N.E.2d at 580-81. In fact, as a guest at the Motel, Krupa owed her "a duty of care by law." *Id.* (footnote omitted).

Since the Policy's "Abuse or Molestation" Exclusion excludes coverage for abuse or molestation by anyone of any person while in the care, custody, or control of **any insured**—and since G.M. alleges she was raped and abused while, at a minimum, in the care, custody, or control of Krupa—the Exclusion bars coverage for the claims for coverage asserted against American Family in this action. Dkt. 35-2 at 54; *Holiday Hosp.*, 983 N.E.2d at 581.[10] Put differently, G.M. asserts claims that are necessarily barred by the "Abuse or Molestation" Exclusion, and there is no circumstance under which G.M. could succeed on the pled allegations without triggering the Exclusion. Thus, the Counterclaim cannot state a claim against American Family, and the Court should dismiss the Counterclaim with prejudice.

2. <u>The Policy Does Not Provide Coverage Because There Was No "Occurrence" And The Policy's Intentional Exclusions Apply</u>

Similarly, the Policy does not provide the coverage sought because G.M. does not allege any "occurrence" and alleges conduct that triggers the Policy's intentionality exclusions.[11]

In general, the Policy contains multiple provisions dictating that coverage does not exist for injuries that are expected or intended. As a threshold matter, to trigger any coverage for "bodily injury" under the Policy, the injury must be "caused by an 'occurrence'"—a term the Policy defines to mean an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." Dkt. 35-2 at 34, 44. Indiana courts have explained, "[i]n the context of

---

[10] The second provision in the "Abuse or Molestation" Exclusion Endorsement would also apply to bar coverage too. But the Court need not evaluate that provision at this time because the first provision precludes coverage.

[11] For purposes of this Brief, the Policy's intentionality exclusions include its "expected or intended" provision, its "knowledge" provision, and its "criminal acts" provision. Dkt. 35-2 at 36, 39.

insurance coverage, an accident means an unexpected happening without an intention or design." *State Farm Fire & Cas. Co. v. C.F.*, 812 N.E.2d 181, 184 (Ind. Ct. App. 2004) (cleaned up). Other provisions in the Policy similarly bar coverage for intentional or criminal conduct undertaken by the insured or where the insured expected the relevant injuries to occur. *See, e.g.*, Dkt. 35-2 at 36, 39.

In the Underlying Lawsuit, G.M. does not allege her injuries arose out of any "accident" or anything that happened unexpectedly. Instead, G.M. repeatedly asserts that Wyndham *knowingly* benefited from its participation in a venture involving the sexual trafficking of a child. Dkt. 35-1. And G.M. highlights examples of Wyndham's participation. *Id.* According to G.M., Wyndham failed to take any action to stop the trafficking occurring at the Motel despite numerous "red flags" of the trafficking that were "open and obvious to anyone working at [the Motel] and lasted continuously for months." *Id.* at ¶¶ 17, 55-56, 81-87, 125, 129. Such red flags included: loud noises of abuse or other emergency audible to staff, visible signs of prior and private physical abuse, an unusually large number of male visitors asking for G.M., frequent requests for linen changes, and an unusually large number of used condoms in the trash, among other things. *Id.* at ¶ 85.

Moreover, throughout the Complaint, G.M. indicates her alleged abuse and injuries could have been avoided if Wyndham would have acted "properly." Dkt. 35-1. In one allegation, G.M. expressly states that if Wyndham "would have taken proper measures, [it] would not have profited from G.M. and other victims like her being trafficked at [the Motel]." *Id.* at ¶ 125. Elsewhere, G.M. pleads that Wyndham "failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation[ ]" so that Wyndham could "maximize" its profits. *Id.* at ¶ 129.

Based on the allegations, there is nothing fortuitous about G.M.'s alleged damages. Wyndham could not have taken "proper measures" to stop the alleged abuse, as G.M. alleges, if Wyndham was not aware the abuse was occurring the first place. *Id.* at ¶ 125. Knowingly profiting

from participation in a sexual trafficking venture is the opposite of an accident. Under these circumstances, G.M.'s alleged injuries did not result from an "occurrence." *See, e.g.*, *Homesite Ins. Co. v. Schlackman*, 671 F. Supp. 3d 1205, 1215-16 (W.D. Wash. 2023) (finding that sexual trafficking allegations against insured did not result from an "occurrence" where insured was allegedly complicit in the trafficking and it was "reasonably foreseeable" that insured's actions relating to sexual trafficking scheme would result in injuries to the victim).

For the same and similar reasons, the Policy's other "intentionality" provisions would similarly bar coverage. For instance, the Policy's "expected or intended" exception bars coverage because G.M. alleges her injuries were expected or intended from Wyndham's perspective. Dkt. 35-2 at 36.

## C.    <u>Any Remaining Claims Also Fail As A Matter Of Law</u>

While the Counterclaimants assert counts against American Family that relate to Wyndham and SPI's status as "insureds" under the Policy or otherwise relate to their eligibility for coverage from American Family, the Court need not address those counts now because coverage would not exist for Wyndham or SPI even assuming they are "insureds" under the Policy. Dkt. 69 at 38- 44, ¶¶ 78-127.[12] Indeed, even if Wyndham or SPI could potentially obtain coverage under the Policy as insureds or otherwise for the Underlying Lawsuit, the Policy would not provide coverage to them for the reasons stated above. As a result, the Court can dismiss the Counterclaim as a matter of law with prejudice.

Of course, SPI's claims would fail for additional reasons too. For instance, although SPI alleges American Family must defend SPI against the Underlying Lawsuit and that American

---

[12] To be clear, American Family disputes the substantive claims asserted against it relating to these counts and reserves its rights to raise arguments regarding those allegations and others in the Counterclaim, if needed. But again, the Court need not address those disputes because the Counterclaim can be dismissed with prejudice on the grounds set forth in this Brief.

Family breached its obligation to SPI by failing to do so, no "suit" has been asserted against SPI in connection with this matter. Dkt. 69 at 42-44, ¶¶ 111-127. As noted above, the Policy only requires American Family to defend an insured against a covered "suit" asserted against the insured—a term the Policy generally defines to mean "a civil proceeding[.]" Dkt. 35-2 at 45. But G.M. only asserted the Underlying Lawsuit against Wyndham. Dkt. 35-1. G.M. did not name SPI (or Krupa, for that matter) as a defendant in the Underlying Lawsuit. *Id.* Thus, American Family cannot possibly owe the obligations SPI alleges in its Counterclaim, nor has American Family breached those obligations. For this additional reason, SPI's claims against American Family fail as a matter of law.

## CONCLUSION

Since the Counterclaim fails to state any claim against American Family as a matter of law, the Court should dismiss it with prejudice.

Respectfully submitted,

ICE MILLER LLP

*/s/   Samuel B. Gardner*
Nicholas B. Reuhs (# 31181-49)
Samuel B. Gardner (#32825-29)
John D. French (#37629-53)
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282
(317) 236-2100
nicholas.reuhs@icemiller.com
samuel.gardner@icemiller.com
jd.french@icemiller.com

*Counsel for Plaintiff/Counterclaim Defendant American Family Mutual Insurance Company, S.I. f/k/a American Family Mutual Insurance Company*

20

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 12, 2024, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served on all counsel of record thereby.

<u>/s/   Samuel B. Gardner           </u>
Samuel B. Gardner