**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I. (F/K/A AMERICAN FAMILY MUTUAL INSURANCE COMPANY)<br>　　　　Plaintiff<br>　　　　　　*v.*<br>WYNDHAM HOTELS & RESORTS, INC., AKSHAR KRUPA INDIANA, L.L.C. (D/B/A SUPER 8 MOTEL), and G.M., an individual<br>　　　　Defendants | CIVIL ACTION<br><br>NO. 1:24-cv-00506-MPB-MJD |
| WYNDHAM HOTELS & RESORTS, INC.<br>　　　　Defendant / Counterclaim Plaintiff<br><br>*and*<br><br>SUPER 8 WORLDWIDE, INC. (F/K/A SUPER 8 MOTELS, INC.)<br>　　　　Counterclaim Plaintiff<br>　　　　　　*v.*<br>AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I. (F/K/A AMERICAN FAMILY MUTUAL INSURANCE COMPANY)<br>　　　　Plaintiff / Counterclaim Defendant | |

**THE WYNDHAM ENTITIES' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO AMERICAN FAMILY'S MOTION FOR SUMMARY JUDGMENT**

**K&L GATES LLP**
Donald W. Kiel (admitted *pro hac vice*)
Erin Fleury (admitted *pro hac vice*)
One Newark Center
Tenth Floor
Newark, NJ 07102-5252
Telephone: (973) 848-4000
Facsimile:  (973) 848-4001
Donald.Kiel@klgates.com
Erin.Fleury@klgates.com

**BARNES & THORNBURG LLP**
Charles P. Edwards
Lara Langeneckert
Kelsey Dilday Miller
11 South Meridian Street
Indianapolis, IN 46204
Telephone: (317) 231-7777
Facsimile:  (317) 231-7433
Charles.Edwards@btlaw.com
Lara.Langeneckert@btlaw.com
Kelsey.Dildaymiller@btlaw.com

*Attorneys for Defendant/Counterclaim Plaintiff Wyndham Hotels & Resorts, Inc. and
Counterclaim Plaintiff Super 8 Worldwide, Inc. (f/k/a Super 8 Motels, Inc.)*

# TABLE OF CONTENTS

Table of Authorities......................................................................................................................... ii

I.      PRELIMINARY STATEMENT ...................................................................................... 2

II.     FACTS ............................................................................................................................ 4
        A.      Statement of Material Facts in Dispute............................................................... 4
        B.      Statement of Material Facts Not in Dispute........................................................ 7
                1.      Krupa and the Hotel ................................................................................ 7
                2.      Krupa's Businessowners Policy and This Declaratory Judgment
                        Action..................................................................................................... 8

III.    LEGAL ARGUMENT ....................................................................................................11
        A.      Rule 56 Standard ............................................................................................... 12
        B.      Summary Judgment Is Appropriate as to AFM's Duty to Defend ...................... 13
                1.      Duty to Defend Standard ...................................................................... 13
                2.      The Underlying Complaint Alleges Potentially Covered Claims
                        Under the Policy ................................................................................... 15
                        a.      The Underlying Complaint Alleges Liability for "Bodily
                                Injury" and "Personal and Advertising Injury"............................ 15
                        b.      The Underlying Complaint Alleges Liability Against
                                Wyndham for Damages That Were Not Intended by
                                Wyndham .................................................................................... 16
                        c.      The Abuse or Molestation Exclusion Does Not Negate
                                AFM's Duty to Defend ............................................................... 24
                3.      Indiana Public Policy Does Not Bar Coverage for the Underlying
                        Action................................................................................................... 32
                        a.      Standard to Bar Coverage as a Matter of Public Policy
                                Under Indiana Law ...................................................................... 33
                        b.      AFM's Arguments Overlook Several Indiana Public
                                Policies Favoring Coverage ......................................................... 33
                        c.      AFM Fails to Identify Any Relevant Indiana Public Policy
                                Supporting AFM's Position.......................................................... 34
                                i.      AFM Identifies Cases and Statutes Applicable to the
                                        Intentional Commission of Sex Trafficking, Which
                                        Are Irrelevant .................................................................. 36
                                ii.     AFM's Misplaced Reliance on *Nautilus* and
                                        *Samsung* ......................................................................... 38
                4.      SWI Does Not Seek a Defense in the Underlying Action ...................... 41
                5.      Punitive Damages Allegations Do Not Extinguish AFM's Duty to
                        Defend................................................................................................... 42
        C.      AFM's Duty to Indemnify ................................................................................. 43
                1.      Wyndham Is Entitled to Summary Judgment on the Duty to
                        Indemnify Because AFM Has Failed to Set Forth Evidence
                        Supporting Its Claim ............................................................................. 43
                2.      In the Alternative, This Court Should Dismiss or Stay the Case
                        with Respect to AFM's Duty to Indemnify............................................ 45

IV.     CONCLUSION.............................................................................................................. 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. v. Warsaw Cmty. Sch. Corp.*,
  676 F. Supp. 3d 635 (N.D. Ind. 2023) ...................................................................43

*All-Star Ins. Corp. v. Steel B., Inc.*,
  324 F. Supp. 160 (N.D. Ind. 1971) .......................................................................47

*Aluminum Trailer Co. v. Westchester Fire Ins. Co.*,
  24 F.4th 1134 (7th Cir. 2022) ........................................................................14, 31

*Am. Bankers Ins. Co. of Fla. v. Shockley*,
  3 F.4th 322 (7th Cir. 2021) ...................................................................................45

*Am. Family Life Assurance Co. v. Russell*,
  700 N.E.2d 1174 (Ind. Ct. App. 1998).................................................................14

*Auto-Owners Ins. Co. v. Harvey*,
  842 N.E.2d 1279 (Ind. 2006) ................................................................................21

*Burrell v. Meads*,
  569 N.E.2d 637 (Ind. 1991) ...........................................................................25, 26

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).........................................................................................12, 43

*Cincinnati Ins. Co. v. Maint. Dynamics, Inc.*,
  2013 WL 350080 (N.D. Ind. 2013)........................................................................45

*Cooper v. Govt. Emp. Ins. Co.*,
  51 N.J. 86 (1968) ...................................................................................................34

*Doe v. Shaffer*,
  90 Ohio St. 3d 388 (2000)...............................................................................23, 24

*Dorchester Mutual Insurance Company v. Krusell*,
  485 Mass. 431 (2020) ............................................................................................30

*Fed. Ins. Co. v. Stroh Brewing Co.*,
  127 F.3d 563 (7th Cir. 1997) .................................................................................13

*Fed. Kemper Ins. Co. v. Brown*,
  674 N.E.2d 1030 (Ind. Ct. App. 1997)............................................................33, 34

*Frankenmuth Mut. Ins. Co. v. Williams by Stevens*,
690 N.E.2d 675 (Ind. 1997) ...................................................................23

*G.G. v. SalesForce.com, Inc.*,
76 F.4th 544 (7th Cir. 2023) ........................................................ *passim*

*Goodwin v. Yeakle's Sports Bar & Grill, Inc.*,
62 N.E.3d 384 (Ind. 2016) ...................................................................28

*Grant v. N. River Ins. Co.*,
453 F. Supp. 1361 (N.D. Ind. 1978) ......................................................21

*Grinnell Mutual Reinsurance Co. v. Reinke*,
43 F.3d 1152 (7th Cir.1995) .................................................................46

*Hartford Fire Ins. Co. v. Guide Corp.*,
2005 WL 5899840 (S.D. Ind. 2005) ......................................................21

*Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*,
983 N.E.2d 574 (Ind. 2013) .................................................25, 26, 30

*Home Fed. Sav. Bank v. Ticor Title Ins. Co.*,
695 F.3d 725 (7th Cir. 2012) ................................................................14

*Homesite Ins. Co. v. Schlackman*,
671 F. Supp. 3d 1205 (W.D. Wash. 2023)..............................................22

*Lear Corp. v. Johnson Elec. Holdings Ltd.*,
353 F.3d 580 (7th Cir. 2003) ...........................................................45, 46

*Liberty Mut. Fire Ins. Co. v. Red Roof Inns, Inc.*,
2025 WL 2685867 (N.D. Ga. Aug. 15, 2025) ....................3, 19, 20, 40

*Markle v. Hacienda Mexican Rest.*,
570 N.E.2d 969 (Ind. Ct. App. 1991)................................................26, 27

*Martinsville Corral, Inc. v. Soc'y Ins.*,
910 F.3d 996 (7th Cir. 2018) ................................................................12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..............................................................................43

*Med. Protective Co. of Fort Wayne, Indiana v. Am. Int'l Specialty Lines Ins. Co.*,
911 F.3d 438 (7th Cir. 2018) ................................................................12

*Mesa Underwriters Specialty Ins. Co. v. Khamlai Lodging, LLC*,
2022 WL 1135013 (N. D. Ga. 2022) ................................................40, 41

iii

*Millers Cap. Ins. Co. v. Vasant,*
    2018 WL 5295899 (D. Md. 2018) ......................................................................24, 28, 29, 31

*Mt. Hawley Ins. Co. v. Lincoln Hotels, LLC, et al.,*
    2021 WL 1351858 (N.D. Ga. 2021) ..................................................................47, 48

*Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.,*
    600 F.3d 878 (7th Cir. 2010) ..........................................................................12

*Nationwide Ins. v. Zavalis,*
    52 F.3d 689 (7th Cir. 1995) ......................................................................45, 46, 47

*Northfield Ins. Co. v. Northbrook Indus., Inc.,*
    2024 WL 4224628 (N.D. Ga. 2024) ...................................................... *passim*

*Plan-Tec, Inc. v. Wiggins,*
    443 N.E.2d 1212 (Ind. Ct. App. 1983)....................................................19

*Property-Owners Ins. Co. v. Virk Boyz Liquor Stores, LLC,*
    219 F. Supp. 3d 868 (N.D. Ind. 2016) ......................................................13, 31, 42

*Reigh v. WestRock Packaging Sys., LLC,*
    2024 WL 3811825 (N.D. Ind. 2024)......................................................27

*Ricchio v. Bijal, Inc.,*
    424 F. Supp. 3d 182 (D. Mass. 2019) .......................................................3, 19, 40

*Rogers v. Martin,*
    63 N.E.3d 316 (Ind. 2016) ..............................................................................27

*Rosenberg v. Hudson Ins. Co.,*
    638 F. Supp. 3d 510 (W.D. Pa. 2022) ....................................................38

*Samsung Fire & Marine Ins. Co. (U.S. Branch) v. RI Settlement Tr.,*
    2024 WL 4921644 (3d Cir. Aug. 12, 2024)...........................................38, 39, 40

*Sans v. Monticello Ins. Co.,*
    676 N.E.2d 1099 (Ind. Ct. App. 1997).................................................20, 21

*Scottsdale Ins. Co. v. Harsco Corp.,*
    199 N.E.3d 1210 (Ind. Ct. App. 2022)..................................................14

*Seymour Mfg. Co., Inc. v. Com. Union Ins. Co.,*
    665 N.E.2d 891 (Ind. 1996) ...............................................................13, 33

*Smith v. Lutheran Univ. Ass'n, Inc.,*
    2024 WL 5102869 (7th Cir. 2024) .......................................................43

*St. Paul Fire & Marine Ins. Co. v. F.H.*,
    55 F.3d 1420 (9th Cir. 1995) ................................................................34

*Stand. Life & Acc. Ins. Co. v. Martin*,
    33 N.E. 105 (Ind. 1893) .....................................................................33

*Starr Indem. & Liab. Co. v. Choice Hotels Int'l, Inc.*,
    2021 WL 2457107 (S.D.N.Y. 2021) .......................................... *passim*

*Stevenson v. Hamilton Mut. Ins. Co.*,
    672 N.E.2d 467 (Ind. Ct. App. 1996) .....................................................21

*Thomson Inc. v. Ins. Co. of N. Am.*,
    11 N.E.3d 982 (Ind. Ct. App. 2014) .......................................................43

*Ticor Title Ins. Co. of California v. FFCA/IIP 1988 Prop. Co.*,
    898 F. Supp. 633 (N.D. Ind. 1995) .......................................................14

*Town of Orland v. Natl. Fire & Cas. Co.*,
    726 N.E.2d 364 (Ind. Ct. App. 2000) .....................................................20

*Travelers Insurance Cos. v. Penda Corp.*,
    974 F.2d 823 (7th Cir. 1992) ................................................................46

*Travelers Prop. Cas. Co. of Am. v. Salesforce.com, Inc.*,
    2021 WL 1376575 (N.D. Cal. 2021) .....................................................41

*Trisler v. Indiana Ins. Co.*,
    575 N.E.2d 1021 (Ind. Ct. App. 1st Dist. 1991) .......................................14

*USA Gymnastics v. Liberty Ins. Underwriters, Inc.*,
    27 F.4th 499 (7th Cir. 2022) ................................................................12

*Valley Forge Ins. Co. v. Field*,
    670 F.3d 93 (1st Cir. 2012) .................................................................29

*Van Auken v. State*,
    233 N.E.3d 1042 (Ind. Ct. App. 2024) ...................................................37

*WellPoint, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    29 N.E.3d 716 (Ind. 2015) ..............................................32, 33, 39, 40

*Wells v. Wexford of Indiana LLC*,
    2021 WL 663519 (S.D. Ind. 2021) .......................................................19

*Williams v. State*,
    204 N.E.3d 279 (Ind. Ct. App. 2023) .....................................................37

*Winfrey v. NLMP, Inc.*,
    963 N.E.2d 609 (Ind. Ct. App. 2012)........................................................................26

**Statutes**

18 PA. CONS. STAT. § 3011(a)(2)................................................................................40

18 U.S.C. § 1595(a) ....................................................................................................17

18 U.S.C. § 2255(a) ......................................................................................................5

28 U.S.C. § 2201 ........................................................................................................45

Ind. Code § 35-42-3.5-1.1 to -3 ............................................................................36, 37

**Other Authorities**

*Affiliated*, Merriam-Webster's Collegiate® Dictionary (10th ed. 1993) .......................30

RESTATEMENT (SECOND) OF TORTS § 283 (1965) ............................................19

Wyndham Hotels & Resorts, Inc. ("Wyndham") and Super 8 Worldwide, Inc. (f/k/a Super 8 Motels, Inc.) ("SWI"[1] and, collectively with Wyndham, the "Wyndham Entities") submit this brief in support of their motion for summary judgment (the "Motion") (1) declaring that Plaintiff American Family Mutual Insurance Company, S.I (f/k/a American Family Mutual Insurance Company) ("AFM") is required to defend the Wyndham Entities in connection with an underlying action filed in the United States District Court for the Southern District of Ohio captioned *G.M. v. Choice Hotels International, Inc., et al.*, Case No. 2:22-cv-3788-ALM-EPD (the "Underlying Action"), as requested in Counts IV and V of the Wyndham Entities' Counterclaim;[2] and (2) granting summary judgment in favor of Wyndham on AFM's duty to indemnify or, in the alternative, dismissing without prejudice or staying as premature AFM's request for declaratory relief on the duty to indemnity. The Wyndham Entities also submit this brief in opposition to AFM's Motion for summary judgment. Docket No. 145.

AFM seeks summary judgment (1) that it has no duty to defend or indemnify the Wyndham Entities in connection with the Underlying Action; and (2) that the insurance policy it issued to defendant Akshar Krupa Indiana, L.L.C. ("Krupa"), a franchisee of SWI, does not cover the Wyndham Entities' demand to Krupa for defense and indemnification in connection with the Underlying Action. For the reasons set forth herein, this Court should grant the Wyndham Entities' Motion for summary judgment and deny AFM's Motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.

---

[1] AFM refers to SWI as "SPI" in AFM's Motion. *See* Docket No. 145, AFM's Motion for Summary Judgment against Wyndham and SWI; Docket No. 146, AFM's Brief in Support of Its Motion for Summary Judgment (hereinafter, "AFM's Motion" or "AFM's Brief").

[2] *See* Wyndham Answer and Counterclaim, Docket No. 69, at 42-44 (the "Counterclaim"), ¶¶ 111-121 (Count IV); 122-127 (Count V).

## I.     <u>PRELIMINARY STATEMENT</u>

<u>To be clear</u>, and as much as AFM may wish and claim otherwise, this is <u>not</u> a case about whether there is coverage for intentionally "facilitating and knowingly profiting from child sex trafficking[.]" AFM's Brief, Docket No. 146, at 2. <u>Nowhere</u> in the complaint in the Underlying Action (the "Underlying Complaint")[3] is it alleged that the Wyndham Entities definitively "knew" about the alleged trafficking. Instead, it is alleged that Wyndham is civilly liable under the Federal Trafficking Victims Protection Reauthorization Act (the "TVPRA"), based on allegations pled in the alternative (i.e., that Wyndham "knew <u>or should have known</u>") about the trafficking. *E.g.*, Docket No. 150-2, at 4 (Underlying Complaint, ¶ 18). AFM asks this Court to be the first court in the country to hold that such TVPRA claims do not trigger an insurer's duty to defend.

A claim asserted under the TVPRA has multiple elements that apply different *mens rea* standards. AFM focuses on the allegations regarding the "knowingly" element. But, for liability to exist in this Circuit, it is not sufficient to just show that the Wyndham Entities "knowingly" profited from their business relationship involving the Hotel (defined below). The Underlying Plaintiff must show, among other things, that Wyndham "knew or should have known" that a particular "venture" was engaged in violations of the TVPRA. AFM conflates these elements in order to craft a strawman argument that coverage is sought for a claim that Wyndham intentionally profited from known trafficking. But that is neither the nature of the Underlying Action, nor is it consistent with the Seventh Circuit's interpretation of the TVPRA.

Instead, this case is about whether an insurer's duty to defend is triggered by claims alleging violations of the TVPRA, which are premised, at least in part, on alleged failures to detect

---

[3] The Underlying Complaint is attached as Ex. B to the Wyndham Entities' Motion for Summary Judgment at Docket No. 150-2.

and prevent trafficking that itself was committed by third-party criminals. AFM does not, because it cannot, identify a single case in which <u>any court</u> has held that an insurer is not obligated to defend its insureds against underlying claims asserted under § 1595(a) of the TVPRA. As far as the Wyndham Entities are aware, <u>every court in the nation</u> that has been asked to interpret whether such TVPRA claims trigger an insurer's duty to defend <u>has resolved the issue in favor of coverage</u>. *E.g.*, *Ricchio v. Bijal, Inc.*, 424 F. Supp. 3d 182 (D. Mass. 2019); *Starr Indem. & Liab. Co. v. Choice Hotels Int'l, Inc.*, 2021 WL 2457107 (S.D.N.Y. 2021); *Northfield Ins. Co. v. Northbrook Indus., Inc.*, 2024 WL 4224628 (N.D. Ga. 2024), *appeal docketed*, No. 24-13333 (11th Cir. 2024); *Liberty Mut. Fire Ins. Co. v. Red Roof Inns, Inc.*, 2025 WL 2685867 (N.D. Ga. Aug. 15, 2025), *appeal docketed*, No. 25-13187 (11th Cir. 2025).

In its strained effort to avoid its coverage obligations, AFM's Motion ignores many key allegations from the Underlying Complaint as well as key facts regarding the Wyndham Entities' role in connection with those allegations. AFM also mischaracterizes and overstates the authorities on which its legal arguments rely.

<u>First</u>, it is undisputed that SWI served only as a <u>franchisor</u>, by permitting Krupa to operate the Hotel using SWI's "Super 8"® trademark branding subject to certain conditions. SWI did not own, operate, manage or control the operations of the Hotel (nor did SWI's ultimate corporate parent, Wyndham). <u>Second</u>, the Underlying Complaint clearly contains allegations against Wyndham that sound in negligence or are otherwise potentially covered, which is all that is required to trigger AFM's duty to defend. <u>Third</u>, AFM misleadingly relies on cases and authorities involving claims against entities that were accused of <u>intentionally</u> and <u>directly</u> <u>perpetrating</u> criminal sex trafficking (or other crimes), which, of course, the Wyndham Entities have never been accused of. <u>Fourth</u>, AFM focuses its argument on the claim that Indiana public policy prohibits

coverage for the Underlying Complaint, despite failing to identify a single Indiana authority that actually supports such a conclusion.

For all of these reasons, the Wyndham Entities are entitled to summary judgment with respect to AFM's duty to defend and as to Counts IV and V of the Counterclaim. In addition, AFM has failed to establish facts to support its claim that it has no duty to indemnify or, in the alternative, a determination that AFM has no duty to indemnify is premature.

## II.    FACTS

### A. Statement of Material Facts in Dispute

The underlying facts in this action are, for the most part, not in dispute between the Parties. However, the narrative set forth in AFM's Statement of Material Facts Not in Dispute (*see* AFM's Brief, Docket No. 146, at 3-9) ("AFM's SOMF") and AFM's Brief, cherry picks allegations from the Underlying Complaint while omitting many relevant allegations and, as a result, mischaracterizes the Underlying Complaint. The Underlying Complaint is a document that speaks for itself and which the Wyndham Entities incorporate herein in its entirety. *See* Docket No. 150-2 (Underlying Complaint). In addition, the Wyndham Entities set forth the facts below, and incorporate those set forth in Section II.B, to rebut AFM's SOMF, including AFM's mischaracterizations of the Underlying Complaint.

On October 24, 2022, the underlying plaintiff, G.M. ("Underlying Plaintiff") filed the Underlying Complaint against Wyndham and various other defendants. *See* Docket No. 150-2 (Underlying Complaint). The Underlying Complaint seeks damages based on allegations that unidentified third-party human traffickers subjected the Underlying Plaintiff to human trafficking that is alleged to have occurred, in part, at an independently owned and operated hotel located at 4033 E. Southport Road in Indianapolis, Indiana (the "Hotel"). *Id*.

4

The Underlying Complaint alleges that unidentified third-party human traffickers booked rooms and thereby used hotels as instrumentalities to perpetrate their crimes and that the various underlying defendants, including Wyndham, knew or should have known that the Underlying Plaintiff was being trafficked and failed to intervene.[4] *Id.*

According to the Underlying Complaint, the Underlying Plaintiff was trafficked at the Hotel between August and October 2016, during the period of the AFM Policy, and she suffered resulting injuries. *E.g., id.* at 15, 45-46 (Underlying Complaint, ¶ 172 (alleging the Underlying Plaintiff "suffered substantial physical and psychological injuries"), ¶ 51 (alleging trafficking "[f]rom approximately August to October 2016")); *see also* AFM's Amended Complaint, Docket No. 35 ("Amended Complaint"), at 6 (¶ 18, setting forth the policy period). The Underlying Complaint sets forth two civil claims for damages against Wyndham and certain other hotel franchisors: (1) a claim pursuant to 18 U.S.C. § 1595; and (2) a claim for "personal injury" pursuant to 18 U.S.C. § 2255(a). Docket No. 150-2, at 45, 46 (Underlying Complaint, ¶¶ 170, 176).

The Underlying Complaint alleges that, although Wyndham was <u>not</u> aware of the alleged trafficking of the plaintiff at the Hotel by alleging repeatedly that Wyndham "knew, or <u>should have known</u>" about the alleged trafficking, *e.g., id.* at 31 (Underlying Complaint, ¶ 122) (emphasis added), Wyndham, *inter alia*: "failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking … failed to require training of all employees on human trafficking policies and procedures [and] … failed to conduct audits confirming compliance with policies and procedures." *E.g., id.* at 13 (Underlying

---

[4] Wyndham denies all allegations of liability set forth in the Underlying Complaint or elsewhere, and by choosing not to address any such allegations in this Motion, Wyndham does not concede the veracity or validity of any such allegations. Rather, all defenses of Wyndham to the allegations of the Underlying Plaintiff are reserved.

Complaint, ¶ 41). The Underlying Plaintiff also alleges that Wyndham failed to "institute proper security measures" and failed "to utilize [massive amounts of] data to combat sex trafficking." *E.g.*, *id.* at 33 (Underlying Complaint, ¶ 129).

The Underlying Complaint also alleges that Wyndham is vicariously or otherwise indirectly liable for the conduct of Krupa and others. For example, the Underlying Complaint alleges that "Wyndham has an actual and apparent agency relationship with the physical property owners of the Indianapolis Wyndham Branded Properties as to establish vicarious liability." *Id.* at 9 (Underlying Complaint, ¶ 26(b)). The Underlying Complaint also alleges that Wyndham's so-called "control" over the Hotel is not direct but is instead based on, *inter alia*, "brand standards" and "the terms of its franchise agreements [with Krupa]." *Id.* at 38 (Underlying Complaint, ¶ 147). The Underlying Complaint further alleges that Wyndham "knowingly benefitted … from its ventures at [the Hotel] through royalty payments, licensing fees, and percentages of gross room revenue generated by the hotel operations, including rates charged through rooms where G.M. was trafficked[.]" *Id.* at 9 (Underlying Complaint, ¶ 26(d)). In other words, the Underlying Complaint asserts that Wyndham's alleged liability arises from its relationship with Krupa and Krupa's operation of the Hotel as a franchisee.

Finally, the Wyndham Entities also specifically dispute AFM's statement that "SPI … joined in Wyndham's Counterclaim against [AFM], generally seeking the same relief as Wyndham." Docket No. 146, at 8 (AFM's Brief). This is not accurate. The Counterclaim carefully distinguishes between the damages alleged and the relief sought by the "Wyndham Counterclaimants" (which the Counterclaim defines as "Wyndham and SWI") as opposed to just "Wyndham." For example, Count IV of the Counterclaim (Breach of Contract) alleges that AFM "is obligated, but has failed, to reimburse Wyndham" (not SWI), and that Wyndham (not SWI) has

suffered damages as a result. Docket No. 69, at 43 (Counterclaim, ¶¶ 118, 120, 121). Similarly, Count V of the Counterclaim (Declaratory Judgment) alleges that Wyndham (not SWI) has suffered damages but that both "may incur" future defense costs and expenses and thus seeks a declaration of the rights and AFM's obligations that have been incurred (by Wyndham) or that "will be incurred in the future" (by either Wyndham or SWI). *Id.* at 69 (Counterclaim, ¶¶ 125-127) (emphasis added).

### B. Statement of Material Facts Not in Dispute

#### 1. Krupa and the Hotel

The Wyndham Entities incorporate the facts set forth in Section II.A and set forth the following additional facts not in dispute.

The Hotel is owned and operated by franchisee Krupa, which is also a defendant in this action. *See* Declaration of M. Mueller ("Mueller Decl."), Docket No. 150-1, at 2 (Mueller Decl., ¶ 4); *see also id.* at 4 (Mueller Decl., Attachment 1) (hereinafter referred to as the "Franchise Agreement"). SWI, as franchisor, and Krupa, as franchisee, entered into a Franchise Agreement dated March 28, 2007. *See generally id.* (Franchise Agreement). The Franchise Agreement permitted Krupa to operate the Hotel as a "Super 8"® lodging facility. Franchise Agreement; *see also id.* at 2 (Mueller Decl., ¶ 3). SWI is a wholly-owned, indirect subsidiary of Wyndham. *See id.* (Mueller Decl., ¶ 5). SWI and Wyndham "did not own, operate, manage, or control the operations of the Hotel." *Id.* (Mueller Decl., ¶ 8). AFM has asserted that Wyndham was a franchisor and admitted that "the Hotel was owned and operated by Krupa." *See* Docket No. 35, at 3 (Amended Complaint, ¶ 8); Docket No. 132, at 10 (Answer to Counterclaim, ¶ 30); *see also* Docket No. 35, at 3 (Amended Complaint, ¶ 9) (admitting that Krupa, at least in part, operated the Hotel "as a franchisee of Wyndham.").

The Wyndham Entities demanded that Krupa indemnify and hold them harmless against any fees and expenses incurred to defend the Underlying Action and any liability incurred in connection with the Underlying Action, as required by Krupa's Franchise Agreement with SWI. *See* Docket No. 150-3 (Wyndham 11/8/2022 Letter). The Wyndham Entities further sought coverage from AFM under an insurance policy to which Krupa was contractually obligated to name the Wyndham Entities as additional insureds. *See* Docket No. 150-4 (Wyndham 12/16/2022 Letter); *see also* Docket No. 35, at 9 (Amended Complaint, ¶ 32); Docket No. 132, at 18 (Answer to Counterclaim, ¶ 68).

2. Krupa's Businessowners Policy and This Declaratory Judgment Action

AFM issued a businessowners liability insurance policy insuring Krupa in connection with its operation of the Hotel for the policy period of December 1, 2015 to December 1, 2016. *See generally* Docket No. 150-5 (the "Policy"); *see also* Docket No. 35, at 6 (Amended Complaint, ¶ 18); Docket No. 132, at 11 (Answer to Counterclaim, ¶¶ 35-36).

The Policy obligates AFM to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury', 'property damage' or 'personal and advertising injury[.]'" AFM's Brief, Docket No. 146, at 6. The Policy also provides that AFM has "the right and duty to defend the insured against any 'suit' seeking those damages." *Id.* The Policy further provides that:

> This insurance applies:
> (1)    To "bodily injury" … only if:
>     (a)    The "bodily injury" … is caused by an "occurrence" that takes place in the "coverage territory[.]"
>     …
> (2)    To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

Policy, Docket No. 150-5, at 50.

The Policy defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 60. The Policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." *Id.* at 59. The Policy defines "personal and advertising injury" to mean, *inter alia*, "injury, including consequential 'bodily injury', arising out of one or more of the following offenses: (a) False arrest, detention or imprisonment[.]" *Id.* at 60.

The Policy contains, *inter alia*, an abuse or molestation exclusion endorsement. *See id.* at 70; Docket No. 35, at 7-8 (Amended Complaint, ¶¶ 25-26). When introducing the abuse or molestation exclusion into Krupa's policies, AFM explained that the endorsement is meant to "eliminate[ ] coverage for an insured business liability in connection with abuse or molestation of people committed by anyone affiliated with your business." Docket No. 150-6, at 1 (AFM 9/14/2015 Letter).[5]

Under the Franchise Agreement, Krupa was required to acquire liability insurance and to name certain Wyndham entities as additional insureds under that insurance. *See generally* Docket No. 150-1, at 4 (Franchise Agreement). The parties have stipulated that Wyndham and SWI are additional insureds under the Policy. *See* Stipulation, Docket No. 108; *see also* AFM's Brief, Docket No. 146, at 8.

The Wyndham Entities timely notified AFM of the Underlying Action on December 16, 2022 and requested insurance coverage in connection with the same. *See* Docket No. 150-4 (Wyndham 12/16/2022 Letter); *see also* Docket No. 35, at 9 (Amended Complaint, ¶ 32); Docket No. 132, at 18 (Answer to Counterclaim, ¶ 68). Ten months later, on October 25, 2023, AFM

---

[5] The abuse or molestation exclusion in the umbrella policy that is the subject of AFM's 9/14/2015 Notice, Form CU 21 12 09 00, is materially identical to the exclusion in the Policy. *Compare* Docket No. 150-5, at 70 (Policy), *with* Docket No. 150-7, at 20 (Form CU 21 12 09 00).

agreed to provide Wyndham with a defense, subject to a reservation of rights. *See* Docket No. 150-8 (AFM 10/25/2023 Letter). On March 19, 2024, AFM filed this action (filing an amended complaint on June 24, 2024), seeking (1) a declaratory judgment that it does not owe its insured, Wyndham, either a duty to defend or a duty to indemnify in connection with the Underlying Action, and (2) that the Policy does not cover Krupa in connection with the Wyndham Entities' demand that Krupa indemnify them in connection with the Underlying Action. *See generally* Amended Complaint, Docket No. 35.

AFM's Amended Complaint asserts three counts against Wyndham.[6] In its <u>first</u> count, AFM "seeks a declaration that the Policy does not provide coverage—defense or indemnity—to Wyndham in connection with the Underlying Action pursuant to its terms." *Id.* at 12 (Amended Complaint*,* ¶ 51). In its <u>second</u> count, AFM "seeks a declaration that the Policy does not provide coverage for the punitive or exemplary damages sought in the Underlying Lawsuit." *Id.* at 13 (Amended Complaint, ¶ 55). In its <u>third</u> count, AFM seeks a declaration that "[a]s a matter of public policy, there is no duty on [AFM] to defend or indemnify actions arising out of Wyndham's alleged conduct relating to human and sex trafficking, as claimed in the Underlying Lawsuit." *Id.* at 15 (Amended Complaint, ¶ 71).

The Wyndham Entities filed a Counterclaim against AFM which asserted (1) three counts arising from AFM's representations and subsequent denial that certain Wyndham entities were additional insureds under the Policy; and (2) a count for breach of contract (Count IV) and one for declaratory judgment (Count V). *See generally* Counterclaim, Docket No. 69. AFM since

---

[6] AFM also asserts a count against Krupa, which "seeks a declaration that Policy does not provide coverage to [Krupa] in connection with Wyndham's demand to [Krupa] for defense and indemnity in connection with the Underlying Lawsuit." Docket No. 35, at 15 (Amended Complaint, ¶ 75). This count does not seek a declaration with respect to the Wyndham Entities and thus it is not the subject of this Motion.

conceded that the Wyndham Entities are additional insureds and, as a result, the parties resolved and dismissed Counts I-III of the Counterclaim by joint stipulation. *See* Stipulation, Docket No. 108. Count IV of the Counterclaim seeks a ruling that AFM breached its duty to reimburse Wyndham (not SWI) for defense costs and Count V seeks a declaration of the Wyndham Entities' rights with regard to AFM's obligation to pay defense costs incurred or that may be incurred in the future in connection with the Underlying Action. Docket No. 69, at 44 (Counterclaim, ¶ 127)

III.    **LEGAL ARGUMENT**

AFM's Amended Complaint generally seeks a declaration that AFM owes no duty to defend or indemnify Wyndham.

As set forth in greater detail herein, there are no genuine issues of material fact that would prevent this Court from determining that the Underlying Action triggers AFM's duty to defend, because the duty to defend is determined by looking at whether the factual allegations in the Underlying Complaint set forth <u>any</u> potentially covered claims. Here, the Underlying Complaint clearly sets forth claims that might fall within the scope of coverage.

AFM is also not entitled to summary judgment with respect to its duty to indemnify because the question of indemnity depends on factual findings in the Underlying Action, which has not concluded, and AFM has failed to set forth facts on which a reasonable jury could conclude it has no duty to indemnify. Indeed, AFM has <u>no</u> facts to support its burden of proof to demonstrate that it has no duty to indemnify, and it is unable to come forward with any such facts, entitling Wyndham to summary judgment on the duty to indemnify.

Accordingly, the Wyndham Entities respectfully request this Court (1) grant summary judgment in their favor with respect to AFM's duty to defend, including as to Counts IV and V of the Wyndham Entities' Counterclaim; and (2) declare that AFM has failed to establish facts to

support its claim that it has no duty to indemnify or, in the alternative, stay or dismiss AFM's request for a declaration that it has no duty to indemnify as premature. Likewise, AFM's Motion for summary judgment should be denied in its entirety.

## A. Rule 56 Standard

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018) (quoting *Celotex*, 477 U.S. at 322).

A nonmovant "must present something more than a mere scintilla of evidence … or some metaphysical doubt as to the material facts to survive summary judgment." *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, 600 F.3d 878, 882 (7th Cir. 2010) (citations and quotations omitted). Therefore, a court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant based on the designated admissible evidence. *Med. Protective Co. of Fort Wayne, Indiana v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018) (citation omitted). "Proper interpretation of an insurance policy, even if it is ambiguous, generally presents a question of law that is appropriate for summary judgment." *USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 512 (7th Cir. 2022) (citations and quotations omitted).

**B. Summary Judgment Is Appropriate as to AFM's Duty to Defend**

This Court should grant summary judgment in favor of the Wyndham Entities and declare that AFM is obligated to reimburse the Wyndham Entities' defense costs in the Underlying Action. In determining whether an insurer owes a duty to defend, courts look to whether the allegations of the underlying complaint present <u>any</u> possible factual or legal basis on which the insurer might be obligated to indemnify. The breadth of this standard is consistent with Indiana law that the duty to defend is considerably broader than the duty to indemnify. *See* Section III.B.1.

There is no dispute of material fact as to AFM's duty to defend because AFM's duty to defend is based on the Underlying Complaint, which raises several possible factual or legal bases on which AFM might be obligated to indemnify Wyndham, each of which is sufficient by itself to trigger AFM's duty to defend.

1. Duty to Defend Standard

An insurer's duty to defend is separate from and "considerably broader than the duty to indemnify." *Fed. Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563, 566 (7th Cir. 1997) (applying Indiana law) (citing *Seymour Mfg. Co., Inc. v. Com. Union Ins. Co.*, 665 N.E.2d 891, 892 (Ind. 1996)).

Importantly, an insurer's duty to defend requires it to fully defend "mixed" claims (i.e., claims involving both potentially covered and uncovered claims) and "an insurer must defend an action <u>even if only a small portion</u> of the conduct" alleged in the complaint "might" fall within the scope of the insurance policy. *Property-Owners Ins. Co. v. Virk Boyz Liquor Stores, LLC*, 219 F. Supp. 3d 868, 873 (N.D. Ind. 2016) (applying Indiana law) (emphasis added) (citing *Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1122 (7th Cir. 1994) ("If the policy is otherwise applicable, the insurance company is required to defend even though it may not be responsible for all of the damages assessed.")); *Stroh Brewing*, 127 F.3d at 566. Indeed, an insurer is excused from defending its insured "<u>only if</u> there is <u>no possible factual or legal basis</u> on

which the insurer might be obligated to indemnify[.]" *Aluminum Trailer Co. v. Westchester Fire Ins. Co.*, 24 F.4th 1134, 1136-37 (7th Cir. 2022) (applying Indiana law) (emphases added and quotation omitted).

This determination is based on the allegations in the underlying complaint, which must be liberally construed in favor of the insured. *See Scottsdale Ins. Co. v. Harsco Corp.*, 199 N.E.3d 1210, 1219 (Ind. Ct. App. 2022), *transfer denied*, 208 N.E.3d 1253 (Ind. 2023); *Ticor Title Ins. Co. of California v. FFCA/IIP 1988 Prop. Co.*, 898 F. Supp. 633, 641 (N.D. Ind. 1995) (applying Indiana law). It is the nature of the underlying claim, not its merit, which establishes the insurer's duty to defend. *Trisler v. Indiana Ins. Co.*, 575 N.E.2d 1021, 1023 (Ind. App. 1st Dist. 1991) ("[I]f it is determined that an insurer has a contractual duty to defend a suit based upon risks it has insured, the insurer will not be relieved of that obligation, regardless of the merits of the claim.") (citation omitted). Because the merits of the underlying claim are not dispositive of an insurer's duty to defend, *see Home Fed. Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 732 (7th Cir. 2012) (applying Indiana law), an insurer has a duty to defend even if the allegations are groundless or false, as long as the type of claim asserted was potentially insured under the policy.

Coverage exclusions are also construed "strictly against the insurer, and the insurer bears the burden of showing that an exclusion applies." *Id.* at 732 (citations omitted). Thus, to bar coverage, an exclusion "must clearly and unmistakably bring within its scope the particular act or omission that will bring the exclusions into play, and any doubts to the coverage under the policy shall be construed against the insurer to further the policy's basic purpose of indemnity." *Am. Family Life Assurance Co. v. Russell*, 700 N.E.2d 1174, 1177 (Ind. Ct. App. 1998) (citations omitted).

Here, where the Underlying Complaint alleges injuries arising from alleged violations of the TVPRA, which turn in part on what Wyndham "should have known" about the alleged trafficking, there is no question that these are the types of non-intentional claims potentially covered under the Policy.

2.   <u>The Underlying Complaint Alleges Potentially Covered Claims Under the Policy</u>

With respect to the first count of AFM's Amended Complaint, that the policy language defeats coverage, AFM can only succeed if its coverage defeating arguments preclude coverage for <u>all</u> potential claims. Thus, even if the Underlying Complaint contains <u>some</u> allegations that AFM contends would not fall within AFM's coverage obligations, that alone is insufficient for AFM to escape its duty to fully defend "mixed" claims. Each of AFM's arguments either (1) would not entirely bar coverage even if AFM is correct; or (2) would require the Court to engage in fact-finding that would improperly overlap or interfere with the Underlying Action and is improper at the duty-to-defend stage. This Court should grant the Wyndham Entities' Motion and rule that the Underlying Complaint triggers AFM's duty to defend.

a.   *The Underlying Complaint Alleges Liability for "Bodily Injury" and "Personal and Advertising Injury"*

As a threshold matter, AFM does not appear to dispute that the Underlying Complaint seeks damages "because of" at least some of the types of damages that would trigger the Policy's insuring agreement. AFM has never denied the Underlying Complaint alleges liability against Wyndham for "bodily injury," which the Policy defines as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Docket No. 150-5, at 59 (Policy). For example, the Underlying Complaint alleges that G.M. has been "permanently injured and damaged physically[.]" Docket No. 150-2, at 34 (Underlying Complaint, ¶ 130).

15

The Underlying Complaint also sets forth potential allegations of "personal and advertising injury[,]" which the Policy defines to mean, *inter alia*, "injury, including consequential 'bodily injury', arising out of … False arrest, detention or imprisonment[.]" Docket No. 150-5, at 60 (Policy). For example, the Underlying Complaint alleges that G.M.'s injuries arise, at least in part, from her allegedly being "kidnapped, and imprisoned" and "held captive" by third-party traffickers at the Hotel. Docket No. 150-2, at 2, 14, 15 (Underlying Complaint, ¶¶ 9, 46, 47, 51).

     *b.  The Underlying Complaint Alleges Liability Against Wyndham for Damages That Were Not Intended by Wyndham*

It is clear that the Underlying Complaint sets forth allegations of damages of the type covered by the Policy so, in an attempt to escape its coverage obligations, AFM argues, *inter alia*, "the Policy does not provide coverage because the undisputed facts show there was no 'occurrence' to trigger coverage, and the Policy's intentionality exclusions apply." AFM's Brief, Docket No. 146, at 20. Specifically, AFM incorrectly asserts that "the Underlying Lawsuit contains no allegations of accident [*sic*]" because "[k]nowingly profiting from a trafficking venture is the opposite of an accident." *Id.* at 20-21.[7]

As an initial point, even if AFM were correct that there was no "occurrence" (it is not correct), that alone would not be sufficient for AFM to avoid its duty to defend Wyndham because the Underlying Complaint also sets forth allegations of "personal and advertising injuries," and the Policy makes it clear that "bodily injury" claims must be "caused by an 'occurrence'" whereas "personal and advertising injury" claims must be "caused by an offense[.]" *See* Docket No. 150-5, at 50, 60 (Policy) (the Policy applies to "'personal and advertising injury' caused by an offense"

---

[7] AFM also makes the remarkable claim that "G.M. alleges her injuries were expected or intended from Wyndham's perspective. Dkt. 35-2 [the Policy] at 36." *Id.* at 21. The Underlying Complaint, however, contains no such allegations that G.M.'s injuries "were expected or intended from Wyndham's perspective" and, tellingly, AFM does not even attempt to identify allegations that could support this statement (because there are none), instead citing only to its own Policy.

and providing a list of "offenses," including "false arrest, detention or imprisonment"). AFM's Motion does not argue that there was no "offense," which means that AFM's argument that there was no "occurrence" would not be dispositive at the duty-to-defend stage since AFM is still obligated to defend mixed claims.

Second, AFM's argument cherry-picks and ignores allegations from the Underlying Complaint and, when reviewing the Underlying Complaint in its totality, it is clear the Underlying Complaint sets forth allegations that, if proven, could support a finding of liability that would be based not on intentional wrongful conduct, but on Wyndham's alleged accidental or negligent conduct (i.e., an "occurrence").

For example, the Underlying Complaint alleges that Wyndham breached its legal duty to prevent her trafficking. *See* Docket No. 150-2, at 13, 33-34 (Underlying Complaint, ¶¶ 40, 129). Likewise, the Underlying Complaint repeatedly asserts that Wyndham "should have known" about the alleged trafficking and other conduct. *See id.* at 3, 4, 16, 31, 45, 46 (Underlying Complaint, ¶¶ 14, 18, 57, 122, 170, 171, 178). The Underlying Complaint also asserts a civil cause of action against Wyndham based on 18 U.S.C. § 1595(a), which requires the Underlying Plaintiff to establish that (1) a venture engaged in an act in violation of the TVPRA; (2) the defendant "knew or should have known" the venture was engaged in such an act; (3) the defendant participated in the venture; and (4) the defendant knowingly benefited financially from its participation.[8] *G.G. v. SalesForce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023).

---

[8] Section 1595(a) of the TVPRA permits a civil cause of action against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter[.]" 18 U.S.C. § 1595(a).

AFM misleadingly conflates the four distinct elements of the TVPRA claim by arguing that the Underlying Complaint "contains no allegations of accident" because "G.M. asserts that Wyndham knowingly benefited from participating in a venture involving the sexual trafficking of a child." AFM's Brief, Docket No. 146, at 20. AFM's suggestion misstates the law in this Circuit, which provides that a venture need not be specifically a sex trafficking venture and can be a "commercial venture" like "running a business." *G.G.*, 76 F.4th at 554 (citing *Doe #1 v. Red Roof Inns, Inc.* 21 F.4th 714, 727 (11th Cir. 2021)).[9] The "knowingly benefitted" prong, as interpreted in this Circuit, requires only awareness of some benefit from participation in the commercial venture; the benefit need not be from profits specifically resulting from a sex-trafficking venture. *Id.* at 564.[10] In other words, section 1595(a), as interpreted in *G.G.*, does not require G.M. to prove that Wyndham intended to cause G.M.'s injury. For the purpose of interpreting an insurance obligation, whether a defendant "knowingly benefitted" from a "venture" is <u>not relevant</u> to whether that defendant had knowledge of the alleged trafficking or intended the alleged injury.[11] *Id.* at 559 ("Section 1595 does not require actual knowledge of criminal wrongdoing.").

The second element—a defendant's actual or constructive knowledge that the venture in which they are alleged to have participated violated section 1591—does not alter the analysis for insurance purposes. The Underlying Complaint alleges that Wyndham "knew or should have

---

[9] By describing the law in this Circuit, the Wyndham Entities do not suggest that the law is consistent among the circuits or that they agree with the Seventh Circuit's interpretation of the TVPRA.

[10] Elsewhere in the Underlying Complaint, G.M. alleges that Wyndham "knowingly benefitted, or received something of value, from its ventures at [the Hotel] through royalty payments, licensing fees, and percentages of gross room revenue generated by the hotel operations, including rates charged through rooms where G.M. was trafficked[.]" Docket No. 150-2, at 9 (Underlying Complaint, ¶ 26(d)).

[11] Indeed, by collecting premiums from Krupa, AFM itself "knowingly" profited from the operation of the Hotel and, by extension, from any alleged trafficking occurring at the Hotel.

known" about the trafficking, which are allegations that set forth a negligence standard and not intentional wrongdoing. *See Wells v. Wexford of Indiana LLC*, 2021 WL 663519, at *2 (S.D. Ind. 2021) (describing negligence as the "should have known" standard); *Plan-Tec, Inc. v. Wiggins*, 443 N.E.2d 1212, 1219 (Ind. Ct. App. 1983) ("Failure to act in a reasonable manner will give rise to an action for negligence."); *see also* RESTATEMENT (SECOND) OF TORTS § 283 (1965) ("[T]he standard of conduct to which [an actor] must conform to avoid being negligent is that of a reasonable man under like circumstances."). "The phrase 'knew or should have known,' echoes … an objective standard of negligence" and "it is possible for a defendant to be civilly liable without having violated any of the criminal portions of the TVPA, because the statute permits recovery under a civil standard even in the absence of proof of intentional conduct." *Ricchio*, 424 F. Supp. 3d at 193-94 (citations omitted); *see also Liberty Mut. v. Red Roof*, 2025 WL 2685867, at *6 ("[T]he Court finds that some of Defendant H.B.'s allegations, such as those including the 'should have known' language, do not allege that the Red Roof Defendants acted with the intent or expectation of causing bodily injury."). The Seventh Circuit held that whether a TVPRA defendant "'knew or should have known' that the 'venture ... has engaged in an act in violation' of Section 1591" is "a negligence standard." *G.G.*, 76 F.4th at 555 n.9.

Moreover, even if the Underlying Complaint's TVPRA claims were solely "cast in terms of intentional, not negligent, conduct" (they were not), an insurer still owes a duty to defend wherever the underlying complaint "is reasonably susceptible [to] an interpretation that roughly sketched [a covered claim,]" such as here, where the "claims are brought under a civil [TVPRA] statute where coverage could exist." *Ricchio*, 424 F. Supp. 3d at 195 (holding that insurer must defend hotel operator for TVPRA claims).

AFM is not the first insurer that has tried to escape its coverage obligations for TVPRA claims based on this argument. Courts have rejected AFM's argument because "the civil provision of the TVPRA[,]" which is what is asserted in the Underlying Action, "requires only that one 'knowingly benefit[], ... from participation in a venture which that person <u>knew or should have known</u> has engaged in an act in violation of [the TVPRA]' to be held liable." *Id.* at 193-94 (emphasis in original) (rejecting an insurer's arguments that exclusions based on intentionality could defeat an insurer's duty to defend TVPRA claims); *Liberty Mut. v. Red Roof*, 2025 WL 2685867 (holding that TVPRA claims alleged an "occurrence" and coverage was <u>not</u> precluded by an expected or intended exclusion); *see also Starr Indem.*, 2021 WL 2457107, at *8 (insurer required to defend TVPRA claims against insured hotel franchisor where "allegations attributing knowledge and participation to Choice are brought alongside allegations that the traffickers concealed B.H.'s presence and the assertion that Choice 'should have known' of the trafficking activities").

Moreover, Indiana courts, including in many of the cases AFM cites, have found a fundamental difference between intentional acts causing an intended harm and intentional acts causing unintended harm, such as damages caused by the insured's allegedly negligent conduct (which is covered). For example, coverage is precluded in those limited cases where there is "no set of facts where the losses incurred … would not be intended by [the insured]" and that such a situation is "in sharp contrast" to cases where, as here, the insured could be "liable for bodily injury to a third party based on negligence, and the insurance company is arguing that the conduct rose to the level of intentional." *Town of Orland v. Natl. Fire & Cas. Co.*, 726 N.E.2d 364, 372 n.5 (Ind. Ct. App. 2000) (citation omitted). Thus, negligence or reckless conduct is considered a covered occurrence. *E.g.*, *Sans v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1104 (Ind. Ct. App. 1997) (holding

that an insured who "took a risk increasing the likelihood of harm does not establish the 'specificity to the intent' required for Insurance Company's entitlement to summary judgment") (citation omitted).

Further, an insured is covered for vicarious liability resulting from another person's intentional conduct. *See*, *e.g.*, *Hartford Fire Ins. Co. v. Guide Corp.*, 2005 WL 5899840, at *5 (S.D. Ind. 2005). Indiana courts have also barred coverage for punitive damages when assessed <u>directly</u> against the insured, but not if the punitive damages are assessed <u>vicariously</u> against the insured. *E.g.*, *see Stevenson v. Hamilton Mut. Ins. Co.*, 672 N.E.2d 467, 475 (Ind. Ct. App. 1996) (holding that punitive damages assessed vicariously are typically not against public policy but finding an exception where the insured's "sole shareholder/director … herself perpetrated the willful, and malicious acts[.]"); *Grant v. N. River Ins. Co.*, 453 F. Supp. 1361, 1370-71 (N.D. Ind. 1978) ("[T]o the extent, if any, which an insured … is held vicariously liable for such acts or conduct, public policy does not prevent the shifting of liability for the punitive damages to an insurer[.]").

Similarly, an insured may have intentionally committed an act but there is still coverage where the insured did not intend the specific harm that resulted. For example, in *Auto-Owners Ins. Co. v. Harvey*, the Indiana Supreme Court rejected an insurer's assertion that Indiana law implied limitations on coverage, even where the insured had acted intentionally to push a victim and had even been convicted of a crime (involuntary manslaughter), but there was an open question regarding whether he intended the specific harm that resulted from his admittedly intentional act. The Court recognized the "significant difference" between the law barring "coverage for harm … intentionally inflicted by the insured" and the insurer's argument that Indiana law could assume

an exclusion barring coverage for unintentional harm arising from intentional conduct. *Auto-Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279, 1287 (Ind. 2006) (quotations omitted).

AFM's argument that the Underlying Complaint does not assert an "occurrence" cites to a single case from a federal court in Washington that is not only not precedential and clearly distinguishable, but that employed reasoning that directly contradicts AFM's argument. *See* AFM's Brief, Docket No. 146, at 21 (citing *Homesite Ins. Co. v. Schlackman*, 671 F. Supp. 3d 1205, 1207 (W.D. Wash. 2023) (applying Washington law)). *Schlackman* did not involve a TVPRA claim but instead involved claims of intentional infliction of emotional distress, violations of Washington's Criminal Profiteering Act, and conspiracy. *Id.* at 1208. Specifically, the allegations were that Ms. Schlackman, the insured, had personally distributed drugs to women being sex trafficked; had assisted the trafficker by, for example, shielding his assets by titling property in her name; and had personally harassed and stalked the underlying plaintiff. *Id.* at 1214.

Moreover, the reasoning of *Schlackman* demonstrates the flaws in AFM's argument. As explained by the court, allegations that the insured's conduct was intentional do not necessarily lead to the conclusion that there was no "occurrence." The question is whether the particular harm to the particular claimant "could have been reasonably expected from [the insured's] acts." *Id.* Applying that framework, the court concluded that claims alleging <u>intentional</u> stalking/harassment and <u>knowingly</u> assisting a trafficking scheme by shielding the trafficker's property, did not arise from an "occurrence." <u>However</u>, the court explained that the alleged damages to the underlying claimant as a result of the insured's intentional distribution of drugs was <u>not</u> a reasonably foreseeable harm, because the insured was not aware that the underlying claimant was "being forced to participate in the drug trafficking scheme against her will" and, thus, such allegations <u>did</u> give rise to an "occurrence." *Id.* at 1215 (holding that the insurer "has not clearly established the

absence of an 'occurrence' with regard to the Underlying Complaint's drug trafficking allegations") (citations omitted). Even assuming, *arguendo*, that *Schlackman* was not clearly distinguishable insofar as it <u>only</u> involved claims of intentional criminal conduct, its reasoning that an insured is covered for intentional acts as long as the insured did not intend the specific harm that resulted, is consistent with Indiana law and directly undermines AFM's argument.

There is an obvious distinction between the insurability of the liability of the actual perpetrators of sex trafficking or sexual assault (who "knowingly or intentionally" cause victims to engage in sex trafficking) and those, like Wyndham, the corporate parent of a franchisor, accused of failing to detect or prevent those perpetrators from committing their crimes. <u>First</u>, the Seventh Circuit has specifically noted that distinction with respect to TVPRA claims when it recognized that hotel franchisors are two steps removed from the sex traffickers. *G.G.*, 76 F.4th at 562 ("street-level trafficker –> hotel –> hotel franchisor."). Of course, here, Wyndham is one additional step removed since it is not a hotel franchisor but the corporate parent of a franchisor. <u>Second</u>, the Indiana Supreme Court has recognized and enforced this distinction in a case involving claims of negligence that an insured babysitter had failed to protect a child from sexual molestation at the hands of the babysitter's husband. *See Frankenmuth Mut. Ins. Co. v. Williams by Stevens*, 690 N.E.2d 675, 678 (Ind. 1997) (holding that an intentional acts exclusion did not bar coverage and the insurer's "arguments are essentially an attempt to conflate the conduct of [the negligent insured] with that of her [criminal] husband in order to bring the consent judgment within the intentional act exclusion.").

Many other courts have recognized this distinction. For example, the Ohio Supreme Court acknowledged that, even though there is a strong public policy against sexual molestation, that

strong policy does not bar coverage arising out of an insured's allegedly negligent failure to prevent sexual molestation:

> The express societal condemnation that animates the public policy forbidding insurance for the intentional tort of sexual molestation, however, does not exist for the tort of negligence. Many of the claims against the Diocese and Griffin sound in negligence, and to deny them coverage as an extension of this public policy would be untenable.

*Doe v. Shaffer*, 90 Ohio St. 3d 388, 393 (2000). Just as in *Frankenmuth* and *Shaffer*, many of the claims in the Underlying Complaint set forth allegations sounding in <u>negligence</u> against Wyndham.

### c. The Abuse or Molestation Exclusion Does Not Negate AFM's Duty to Defend

AFM also argues that "[t]he Policy's 'Abuse or Molestation' Exclusion Endorsement bars the coverage sought [by Wyndham] in connection with the Underlying Lawsuit" because, *inter alia*, G.M. was "in the 'care, custody, or control' of Krupa while she was allegedly" trafficked. *See* AFM's Brief, Docket No. 146, at 18-20. As far as the Wyndham Entities are aware, <u>every court</u> interpreting this exclusion in the context of an underlying claim alleging liability by a hotel operator or franchisor arising from alleged human trafficking by third parties, <u>has rejected AFM's argument</u> and held that such abuse or molestation exclusions <u>do not bar coverage</u> at the duty-to-defend stage. *See, e.g.*, *Millers Cap. Ins. Co. v. Vasant*, 2018 WL 5295899 (D. Md. 2018) (rejecting an insurer's argument that an abuse or molestation exclusion barred coverage to the hotel franchisee and the hotel franchisor for alleged sex trafficking by third-party traffickers); *Starr Indem.*, 2021 WL 2457107 (same for TVPRA claims against hotel franchisor); *Northfield*, 2024 WL 4224628 (insurer required to defend underlying TVPRA claim against hotel franchisee).

The consistency of such holdings under similar facts is not at all surprising in light of the fact that a plaintiff's civil claims under the TVPRA will usually, as in the Underlying Complaint, involve alternative factual allegations, *inter alia*, (1) regarding the hotel business' knowledge of the plaintiff's alleged presence at the site; or (2) relating to whether the plaintiff was in the "care,

custody or control" of an insured, which directly impact whether the abuse or molestation

exclusion is triggered. As discussed above, an insurer cannot avoid its duty to defend if the

allegations <u>might</u> fall within coverage and exclusions like this must be construed narrowly.

AFM's Motion does not address, or even identify, any of these analogous decisions but

instead relies on a single case, *Holiday*, which did not involve trafficking claims but instead

involved the intentional molestation of a motel guest by an employee of that motel. AFM's Brief,

Docket No. 146, at 18-20 (citing *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d

574 (Ind. 2013)). *Holiday* does not support AFM's denial, especially at the duty-to-defend stage.

In *Holiday*, the Indiana Supreme Court determined that a motel operator owed a duty of

reasonable care to a young boy as a "business invitee" and, on the basis of that duty of "care," held

that the boy was in the "care" of the motel operator for purposes of an abuse or molestation

exclusion, after he was sexually assaulted in a motel room by a motel employee who used his

access as an employee to break into the boy's room. *Holiday*, 983 N.E.2d 574. The Court based its

conclusion on the "undisputed" fact that the victim was an invitee, and thus "entitled to a duty of

reasonable care." *Id.* at 579-80 & n.8 (explaining it was "undisputed that … [the hotel operator]

owed [the victim] a duty of care by law" because "[a] hotel <u>guest is at least the equivalent of a</u>

<u>business invitee</u> and, as such, <u>is entitled to a duty of reasonable care</u> for the guest's safety")

(emphases added) (citations omitted). In reaching this conclusion, the *Holiday* Court emphasized:

(1) that key facts related to the boy's status were "undisputed"; (2) that whether the victim was in

the "care" of an insured "is a fact-sensitive inquiry" that would only be appropriate if the material

facts were undisputed; and (3) the ruling was "not a bright-line declaration that any guest of any

motel is *ipso facto* 'in the care of' that motel[.]" *Id.* at 579-80 (fact-sensitive inquiry); n.9 (not a

bright-line rule).

In contrast, the Wyndham Entities dispute that G.M. was a business invitee of any insured. Indiana law at the time *Holiday* was decided was clear that a person entering the land of another is classified in one of three categories: an <u>invitee</u>, a <u>licensee</u>, or a <u>trespasser</u>. *Burrell v. Meads*, 569 N.E.2d 637, 639-40 (Ind. 1991). The landowner's duties, if any, are determined based on "the entrant's status." *Id.* ("[T]he entrant's status on the land determines the duty that the landowner (or occupier) owes to him."). "[A] landowner owes <u>the highest duty</u> to an <u>invitee</u>: a duty to exercise reasonable <u>care</u> for his protection while he is on the landowner's premises." *Id.* (emphases added); *see also Holiday*, 983 N.E.2d at 580, n.8 (explaining a business invitee "is entitled to a duty of reasonable care") (quoting *Ellis v. Luxbury Hotels. Inc.*, 716 N.E.2d 359, 360 (Ind.1999)). In contrast, a landowner does <u>not</u> owe a licensee or trespasser a duty of "<u>care</u>;" instead, a landowner owes those individuals a lesser duty to, among other things, "refrain from willfully or wantonly injuring" them.[12]

Thus, whether G.M. was owed a duty of "care" depends on whether G.M. entered the Hotel as an "invitee" of Krupa and remained an "invitee" while at the Hotel. "[A]n invitee is a person who goes onto the land of another at the express or implied invitation of the owner or occupant either to transact business or for the mutual benefit of invitee and owner or occupant." *Winfrey v. NLMP, Inc.*, 963 N.E.2d 609, 612 (Ind. Ct. App. 2012) (citation omitted). However, a business visitor is <u>only</u> an "invitee" <u>to the extent</u> that person "enter[s] or remain[s] on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Burrell*, 569 N.E.2d at 642. Importantly, "even though a visitor may be an invitee when he comes on to the

---

[12] <u>Licensee</u>: "[A]n Indiana landowner owes a licensee the duty to refrain from willfully or wantonly injuring him or acting in a manner to increase his peril. The landowner also has a duty to warn a licensee of any [known] latent danger[.]." *Burrell*, 569 N.E.2d at 639.
<u>Trespasser</u>: "[A] landowner owes a trespasser the duty to refrain from willfully or wantonly (intentionally) injuring him after discovering his presence." *Id.*

property, his status may change to that of a licensee while he is on the premises **if the use to which he puts the property does not correspond to the owner's reason for holding the property open**." *Markle v. Hacienda Mexican Rest.*, 570 N.E.2d 969, 974 (Ind. Ct. App. 1991) (emphasis added) (citation omitted). "[T]o retain invitee status, the invitee must use the owner's premises in the usual, ordinary, and customary way." *Reigh v. WestRock Packaging Sys., LLC*, 2024 WL 3811825, at *3 (N.D. Ind. 2024) (quotation omitted). The landowner also "has the right to determine the scope of a particular invitation and the circumstances under which the invitation may be revoked" and "'when an invitee exceeds the scope of invitation, [he/she] loses [his/her] status'" as an invitee. *Rogers v. Martin*, 63 N.E.3d 316, 326 n.4 (Ind. 2016) (emphasis added) (citation omitted).

In *Holiday*, there was no dispute that the victim was a "business invitee" of the motel operator because he was a guest at the motel and in a room, solely for the purpose of his legal use of the room as short-term lodgings, and his use was the "usual, ordinary, and customary" use and also consistent with the motel operator's "reason for holding the property open" and invitation. *Markle*, 570 N.E.2d at 974 (citation omitted). In stark contrast, G.M. alleges that the traffickers forced her against her will onto the Hotel property for the sole purpose of committing illegal acts that were expressly prohibited by the Hotel's policies and, thus, beyond the scope of any express or implied invitation by Krupa. The Underlying Complaint alleges that "G.M.'s traffickers rented hotel rooms for one purpose—a location to engage in sex trafficking." Docket No. 150-2, at 2 (Underlying Complaint, ¶ 4). This use was beyond the scope of Krupa's invitation to the public to enter the property. As the Underlying Complaint alleges, the hotel defendants "discussed, developed, and implemented uniform policies" against human trafficking, which shows that the

third-party traffickers' illegal use of the Hotel for such a purpose was beyond the scope of their invitation to the premises. *Id.* at 32 (Underlying Complaint, ¶ 126).

The Underlying Complaint also contains allegations that support the finding that Krupa never invited G.M. onto the property and was <u>unaware</u> of G.M.'s presence, which many courts have found to be dispositive in determining whether an abuse or molestation exclusion applies. For example, the Underlying Complaint alleges it was third-party traffickers, not G.M., who rented the rooms and that G.M. was "forced" by those traffickers "onto Defendants' property" and then "imprisoned in hotel rooms rented by her traffickers[.]" *See, e.g.*, *id.* at 2, 15 (Underlying Complaint, ¶¶ 6, 51). The Underlying Complaint also repeatedly alleges in the alternative that the defendants "should have known" or were otherwise not aware of the presence, or at least the trafficking, of G.M. *Id.* at 16 (Underlying Complaint, ¶ 57).[13]

Since *Holiday*, courts in other jurisdictions have ruled that abuse or molestation exclusions do <u>not</u> bar coverage for TVPRA or similar claims. For example, in *Starr Indemnity*, a federal district court was faced with a nearly identical coverage dispute as this action (i.e., an underlying claimant asserting violations of the TVPRA against a hotel operator and hotel franchisor and an insurer denying a duty to defend on the basis of the abuse or molestation exclusion) and distinguished those facts from *Holiday* to conclude that:

> The alleged trafficking venture undertaken by third parties <u>without the knowledge of either insured</u> cannot reasonably be characterized as "arising out of" abuse or molestation that occurred while [the victim] was within an insured's "care, custody or control …." [The insurer] therefore has not demonstrated that the Abuse or Molestation Exclusion relieves it of its duty to defend.

---

[13] Moreover, even if G.M. was an invitee, as AFM suggests by its reliance on *Holiday*, the Indiana Supreme Court changed the duty analysis for third party criminal acts committed against business invitees after *Holiday* was decided. *See Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384 (Ind. 2016). Duty no longer turns solely on the person's status as an invitee, which is what "inform[ed]" the Court's holding in *Holiday*.

*Starr Indem.*, 2021 WL 2457107, at *8 (citation omitted) (emphasis added).

Similarly, in *Millers Capital*, a federal district court rejected an insurer's argument that an abuse or molestation exclusion would bar coverage to the hotel franchisee and the hotel franchisor for alleged sex trafficking by third-party traffickers. *Millers Cap.*, 2018 WL 5295899. The court in *Millers* specifically considered *Holiday* but concluded that it was distinguishable because *Millers* dealt with the abuse of an "unknown guest," as is the case here:

> [T]here is <u>simply no legal basis</u> to find that an innkeeper has care, custody or control of an <u>unknown guest</u> in the hotel. Even if the circumstances are such that the innkeeper may have been negligent for not being aware of the unknown guest or that abuse was occurring on its premises, such circumstances do not bring the unknown guest under the innkeepers' care, custody, or control.

*Id.* at *6 (emphases added) (footnote omitted); *see also Northfield*, 2024 WL 4224628, at *9 (rejecting insurer's argument that an abuse or molestation exclusion barred coverage and ruling that the insurer was obligated to defend an insured hotel operator against TVPRA claims).

<u>Moreover</u>, AFM's reliance on *Holiday* and the abuse or molestation exclusion is misplaced because the alleged abuse or molestation in the Underlying Action was <u>not</u> committed by an employee of any insured, as was undisputedly the case in *Holiday*. Rather, AFM seeks to expand the scope of the abuse or molestation exclusion far beyond (1) the drafting history and purpose for which insurers included this exclusion into policies; or (2) AFM's own representations about the scope of this exclusionary language.

The history of abuse or molestation exclusions provides helpful insight because the exclusion was introduced into insurance policies in response to an increase in sexual abuse claims against schools, churches, medical facilities, or similar organizations in which people, often children, were in the care, custody, or control of such organizations and thus particularly susceptible to alleged abuse by employees of those organizations. *E.g., Valley Forge Ins. Co. v. Field*, 670 F.3d 93, 97 (1st Cir. 2012) (discussing the history of abuse or molestation exclusions

and stating that "these exclusions are used with '[o]rganizations that have care or custody of others—schools, hospitals, nursing homes, day care centers, etc.'") (citation omitted); *see also Starr Indem.*, 2021 WL 2457107, at *9 ("The abuse and molestation exclusion originated in the 1980s in response to an increasing number of far-reaching sexual abuse claims against organizations that alleged harm to children arising from negligent hiring or supervision[.]") (citation and quotations omitted). In other words, these exclusions were drafted to apply to situations where the insured had some "imbalance of power" over the victim and an employee or agent of the insured misused that power to commit abuse or molestation. *Dorchester Mutual Insurance Company v. Krusell*, 485 Mass. 431, 443 (2020) ("[T]he fact that one of the contexts in which such [abuse or molestation] provisions first arose involved the physical or sexual abuse of parishioners by priests reaffirms that the term 'abuse' implies a qualitative aspect, such as an imbalance of power, to the harmful conduct[.]").

In light of this industry understanding and history, it is not at all surprising that AFM told Krupa the same—i.e., that the exclusion does <u>not</u> apply to liability involving abuse or molestation committed by third-parties that are not affiliated with Krupa's business. Instead, as illustrated by a September 14, 2015 notification from AFM to Krupa, AFM told Krupa the following:

> **Abuse or Molestation Exclusion CU 21 12 09 00**
> This endorsement eliminates coverage for an insured business liability in connection with abuse or molestation of people **committed by anyone affiliated with your business**. It applies to abuse and molestation incidents, including threats of abuse against "any person **while in the care, custody or control of any insured**."

*See* Docket No. 150-6 (emphases added). As AFM explained at that time, the exclusion eliminates coverage for abuse or molestation "<u>committed by anyone affiliated with [Krupa's] business</u>." *Id.* (emphasis added). Merriam-Webster Dictionary defines "affiliated" to mean "closely associated with another <u>typically in a dependent or subordinate position</u>." *Affiliated*, Merriam-Webster's Collegiate® Dictionary (10th ed. 1993) (emphasis added).

This was precisely the situation in *Holiday*, where the Indiana Supreme Court determined that a young boy was in the "care" of a motel operator for purposes of an abuse or molestation exclusion, after he was sexually assaulted <u>by a motel employee</u> who used his employee access key to break into the boy's room. *Holiday*, 983 N.E.2d at 580-81. That, of course, is <u>not</u> the case here, where neither AFM nor G.M. allege Wyndham or Krupa, or their affiliates, committed any abuse or molestation of G.M. To the contrary, both AFM and G.M. allege G.M. was abused at the hands of third-party traffickers. Docket No. 150-2, at 14 (Underlying Complaint, ¶ 47) ("G.M. was held captive and sold for sex <u>by her traffickers</u>") (emphasis added).

Whether G.M. was in the "care, custody or control of any insured" will depend on facts that have not yet been developed in the Underlying Action, but the Underlying Complaint clearly alleges facts suggesting that, unlike the invitee/victim in *Holiday*, G.M. was <u>not</u> a business invitee of Krupa nor was she abused by someone affiliated with Krupa's business, and thus she was not in the care, custody, or control of any insured. Because the Underlying Complaint does not conclusively establish that G.M. "was in the 'care, custody or control'" of any insured,[14] AFM cannot rely on this exclusion to avoid its duty to defend. When such factual issues exist with respect to the application of a policy exclusion, the insurer is obligated to defend. *Virk Boyz*, 219 F. Supp. 3d at 873. Given the existence of allegations that potentially fall within the scope of coverage, AFM cannot show, as a matter of law, that there is "no possible factual or legal basis on which [AFM] might be obligated to indemnify" Wyndham. *See id.* ("[A]n insurer must defend an action even if only a small portion of the conduct alleged in the complaint falls within the scope of the insurance policy.") (citation omitted); *Aluminum Trailer*, 24 F.4th at 1136-37 (quotation omitted).

---

[14] Moreover, Wyndham has specifically denied this allegation, so AFM would not be entitled to summary judgment on this basis regardless. *See, e.g.*, Docket No. 69, at 19 (Answer, ¶ 47).

This Court should decline AFM's invitation to apply the abuse or molestation exclusion more broadly than what any other court has done for TVPRA or similar claims (*see Starr Indemn.*, 2021 WL 2457107; *Millers*, 2018 WL 5295899; *Northfield*, 2024 WL 4224628)) and should also not interpret the Policy in a manner that is broader than AFM's own prior representations to Krupa regarding the meaning of this language.

### 3. Indiana Public Policy Does Not Bar Coverage for the Underlying Action

Likely recognizing that each of its Policy-based arguments has repeatedly been rejected by courts when confronted with similar underlying claims, AFM's primary legal argument is that it is relieved of honoring its contractual obligation due to Indiana public policy. AFM's Brief, Docket No. 146, at 11. AFM's focus on this argument is telling in light of the fact that this Court previously denied AFM's motion to dismiss the Counterclaim on public policy grounds and explained that there is an absence of "definitive authority from the Indiana Supreme Court" and that "[a]pplying Indiana *law*—not adopting a particular public *policy*—is the role of this Court." *See* Order Denying AFM's Motion to Dismiss, Docket No. 129, at 8-9.

This Court's caution was warranted, because invalidating a freely bargained-for insurance contract on the basis of public policy is something that should only be done under extraordinary circumstances especially if, as here, it would require a federal district court to predict how the Indiana Supreme Court would rule on a state law issue of first impression. Rather than recognizing this Court's prudent reticence to answer questions of Indiana public policy, AFM instead continues pushing and prioritizing its public policy argument. Nonetheless, AFM's argument fails now for the same reasons as before, because AFM fails to identify <u>any</u> Indiana public policy applicable to Wyndham's alleged conduct, while ignoring Indiana's well-defined public policies that exist in favor of the enforceability of contracts and an "expansive" application of insurers' duty to defend.

a. *Standard to Bar Coverage as a Matter of Public Policy Under Indiana Law*

The Indiana Supreme Court has made it clear that there is a "very strong presumption of enforceability of contracts" and that an insurer seeking to invalidate its bargained-for obligations under an insurance contract on public policy grounds bears the burden to identify a "well-defined and dominant Indiana public policy prohibiting coverage for specific intentional conduct[.]" *WellPoint, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 N.E.3d 716, 724-25 (Ind. 2015), *opinion modified on other grounds on reh'g,* 38 N.E.3d 981 (Ind. 2015). Any purported public policy that an insurer seeks to rely on to invalidate a contract must be set forth by Indiana's "[c]onstitution, its statutes, the practice of its officers in the course of administration, and the decisions of its court of last resort." *Id*. at 724 (quotation omitted).

b. *AFM's Arguments Overlook Several Indiana Public Policies Favoring Coverage*

Several well-defined public policies (set forth by the Indiana Supreme Court and ignored by AFM) contradict AFM's position and instead favor coverage here, especially on AFM's duty to defend. For example, the Indiana Supreme Court has recognized well-defined and dominant Indiana public policies in favor of:

(i)     an insurer's broad duty to defend, *see Seymour Mfg.*, 665 N.E.2d at 892 ("the duty to defend is broader than an insurance company's coverage liability or its duty to indemnify") (citation omitted);

(ii)    avoiding forfeitures of insurance rights, s*ee Stand. Life & Acc. Ins. Co. v. Martin*, 33 N.E. 105, 108 (Ind. 1893) ("A forfeiture will not be enforced, unless unavoidable. … Indemnity being the object of insurance, the policy will be construed liberally to secure that end."); and

(iii)   the "'very strong presumption of enforceability' of contracts." *WellPoint*, 29 N.E.3d at 724.

Accepting AFM's public policy argument would also undermine one of the primary societal purposes of insurance, which is to compensate victims. AFM is not, as it suggests, altruistically seeking to protect alleged victims of sex trafficking; it is seeking only to protect its

33

own pockets at the expense of those alleged victims. Insurance, when honored, provides many benefits that promote the public interest, including compensating victims, and courts across the nation, including in Indiana, have recognized there is a public policy in favor of interpreting insurance to compensate victims. *See, e.g.*, *Fed. Kemper Ins. Co. v. Brown*, 674 N.E.2d 1030, 1036 (Ind. Ct. App. 1997) (concluding that an insured's argument about Indiana's "public policy in favor of compensating accident victims" was "well-taken"); *St. Paul Fire & Marine Ins. Co. v. F.H.*, 55 F.3d 1420, 1424 (9th Cir. 1995) ("[P]ublic policy permits innocent victims of insureds' intentional misconduct to be compensated by … liability policies.") (citations omitted); *Cooper v. Govt. Emp. Ins. Co.*, 51 N.J. 86, 94 (1968) ("It would also disserve the public interest, for insurance is an instrument of a social policy that the victims of negligence be compensated.").

For <u>years</u>, AFM collected premiums and knowingly profited from the operation of the same Hotel it accuses Wyndham of profiting from. AFM collected those premiums and now seeks a windfall at the expense of, *inter alia*, the alleged victim of allegedly negligent conduct that, if her claims are proven, is the type of unintended harm that the Policy was purchased to compensate.

### c. AFM Fails to Identify Any Relevant Indiana Public Policy Supporting AFM's Position

Faced with the "very strong presumption" that coverage is not barred by public policy and the burden to identify a dominant Indiana public policy as set forth in Indiana's "[c]onstitution," "statutes," "the practice of its officers in the course of administration," or "decisions of its court of last resort," AFM fails to identify a single Indiana case (let alone one from Indiana's "court of last resort"), statute, or other authority suggesting that a hotel franchisor's corporate parent's allegedly negligent conduct is uninsurable as against public policy. Indeed, this Court has already explained that there is an absence of "definitive authority from the Indiana Supreme Court" on this issue. *See* Order Denying AFM's Motion to Dismiss, Docket No. 129, at 8.

Instead, AFM buries its head in the sand and ignores that the Underlying Complaint includes factual allegations that, at least in part, sound in negligence. *G.G.*, 76 F.4th at 555 n.9. AFM has alleged that Wyndham was a franchisor and admitted "that the Hotel was owned and operated by Krupa." *See* Docket No. 35, at 3 (Amended Complaint, ¶ 8); Docket No. 132, at 10 (Answer to Counterclaim, ¶ 30). Wyndham did not own, operate, manage, or control the operations of the Hotel. *See* Docket No. 150-1, at 2 (Mueller Decl., ¶ 8). Yet AFM argues as though Wyndham has been accused of intentionally and directly engaging in criminal sex trafficking, which Wyndham has not. In support of this fiction, AFM then identifies several irrelevant Indiana public policies (such as a policy against indemnifying an insured for its own intentional harm; or criminal statutes that do not apply to Wyndham's alleged conduct) to argue that coverage is barred because Indiana has "expressed and established a public policy against human and sexual trafficking[.]" AFM's Brief, Docket No. 146, at 12.

AFM's overzealous efforts to paint Wyndham as such an actor are outrageous and offensive, especially considering that AFM is claiming to contribute to the defense of Wyndham in the Underlying Action while simultaneously arguing in this action that Wyndham's conduct was "intentional or criminal." *Id.* at 20. No other entity has accused Wyndham of such conduct (including G.M. or any law enforcement agencies) but AFM nonetheless asks this Court to paint Wyndham with the same brush as felons and criminals accused of perpetrating sex trafficking, other sexual abuse crimes, and "acts of evil." *Id.* at 13.[15] That is the basis on which AFM asks this Court to make a first-of-its-kind ruling that Indiana public policy bars coverage for a claim that is based, in part, on the alleged negligence of a hotel franchisor's corporate parent, even though this Court has already declined to do so.

---

[15] Wyndham reserves all rights to assert bad faith claims against AFM.

In order to cobble together this remarkable argument, AFM relies on two categories of authorities: (1) Indiana cases and statutes that discuss the criminal perpetrators of intentional sexual abuse or sex trafficking; and (2) a misleading and incomplete description of certain cases from the Eastern District of Pennsylvania.

> i.   AFM Identifies Cases and Statutes Applicable to the Intentional Commission of Sex Trafficking, Which Are Irrelevant

AFM relies on a handful of lower court decisions and statutes that stand for the unremarkable proposition that Indiana law criminalizes intentional conduct committed by those directly perpetrating sex trafficking or sexual abuse. None of these Indiana authorities involves allegations of negligent conduct similar to G.M.'s allegations against Wyndham and are thus irrelevant to whether coverage to an entity such as Wyndham should be barred as a matter of public policy. *See* Section III.B.2.b (discussing G.M.'s allegations).

AFM points to Indiana statutes criminalizing sex trafficking for its proposition that "Indiana has expressed and established a public policy against human and sexual trafficking[,]" AFM's Brief, Docket No. 146, at 12, but fails to recognize that Wyndham has not been accused of, let alone charged or convicted with, a violation of any such Indiana law. Nor does AFM even attempt to demonstrate how Wyndham's alleged conduct would violate the elements of any Indiana statute. The reason for this failure is obvious and unsurprising; the Indiana human trafficking statute AFM identifies is clearly not applicable to Wyndham. Instead, it applies only to the conduct of:

(i)    The third-party perpetrators of human trafficking that "knowingly or intentionally" recruit or transport children "with the intent of causing the child to engage in prostitution [or other sexual conduct.]" *See* Ind. Code § 35-42-3.5-1.2; *see also* § 35-42-3.5-1.1 (one who "knowingly or intentionally" uses force or coercion to cause an individual to participate in prostitution or certain other sexual conduct); § 35-42-3.5-1.3 ("knowingly or intentionally sells or transfers custody of a child … for the purpose of prostitution" or other sexual misconduct); and

> (ii)     The so-called "Johns" that "knowingly or intentionally" pay money or "offer[] a benefit … to or for a human trafficking victim with the specific intent to induce or obtain the product or act for which the human trafficking victim was trafficked[.]" *See* Ind. Code § 35-42-3.5-1.4.

<u>This statute actually undermines AFM's argument</u> because it shows that the Indiana legislature sought to impose punishment only on the individuals that actively engage in human trafficking but did not draft the law so broadly as to sweep in entities, such as Wyndham, that are multiple steps removed from such conduct. Although Indiana Code § 35-42-3.5-3 creates a civil cause of action against individuals that have been <u>criminally convicted</u> of human trafficking offenses, it does <u>not</u> create a right to a civil cause of action against an entity like Wyndham under the undisputed facts of this case. *See* Ind. Code § 35-42-3.5-3 ("If <u>a person</u> <u>is convicted</u> of an offense under sections 1 through 1.4 of this chapter, the victim of the offense … has a civil cause of action <u>against the person convicted</u> of the offense[.]") (emphases added).

AFM next identifies a handful of Indiana cases in the same vein, which support the unremarkable proposition that "Indiana courts have also supported the public policy against human and sexual trafficking." AFM's Brief, Docket No. 146, at 13. But, once again, AFM exclusively identifies cases involving <u>intentional</u> criminal conduct that is not comparable to the claim G.M. has asserted under the TVPRA. The only Indiana cases AFM identifies regarding sex trafficking have nothing to do with insurance and instead merely show the unsurprising fact that Indiana courts have convicted individuals found to have "knowingly or intentionally" engaged in sexual conduct or sex trafficking of a minor. *See Van Auken v. State*, 233 N.E.3d 1042, 1047 (Ind. Ct. App. 2024) ("Van Auken admitted that he had engaged in … sex with D.M. [a minor] and had solicited such acts from him."), *transfer denied*, 238 N.E.3d 646 (Ind. 2024); *Williams v. State*, 204 N.E.3d 279, 282 (Ind. Ct. App. 2023) (discussing whether the admission of certain evidence violated the

Constitutional rights of a man convicted of child sex trafficking after he "advertise[d]" the minor "to potential Johns and … arrange[d] meetings with individuals for [the minor] to have sex with."), *reh'g denied* (Mar. 16, 2023), *transfer denied,* 211 N.E.3d 1003 (Ind. 2023). In other words, AFM has only shown that it is illegal for an individual to <u>intentionally</u> commit sex trafficking or similar crimes, which is entirely irrelevant to the coverage question before this Court.

To be clear, the Wyndham Entities do not dispute that Indiana law criminalizes <u>intentionally</u> engaging in certain conduct related to human trafficking or sexual abuse. But, here, nobody has alleged that any of the Wyndham Entities have violated any such Indiana statutes. The fact that Indiana has enacted and enforced laws that would apply to the sex traffickers does not establish anything with respect to entities, such as Wyndham, that did not engage in sex trafficking but are instead being accused of failing to detect and prevent the alleged trafficking.

      ii.    AFM's Misplaced Reliance on *Nautilus* and *Samsung*

AFM next identifies a series of cases (*Nautilus* and *Samsung*) from the Eastern District of Pennsylvania,[16] which generally involved an inquiry regarding whether Pennsylvania public policy precludes insurance coverage for a hotel operator (not the corporate parent of a hotel franchisor) accused of violating Pennsylvania's human trafficking statutes, not the TVPRA, based on alleged sex trafficking committed by third-party traffickers. These cases are not sufficient to overcome Indiana's "very strong presumption" against invalidating coverage for several reasons.

---

[16] AFM also cites to *Rosenberg* in arguing that "other courts have determined public policy precludes coverage for claims arising out of sexual trafficking[.]" AFM's Brief, Docket No. 146, at 16. *Rosenberg*, however, involved coverage for claims alleging the insureds concealed a weapon used by their son to shoot and kill the claimant's son to delay a criminal investigation. *Rosenberg v. Hudson Ins. Co.*, 638 F. Supp. 3d 510, 521 (W.D. Pa. 2022), *aff'd*, No. 22-3275, 2025 WL 457306 (3d Cir. Feb. 11, 2025). *Rosenberg* had <u>nothing</u> to do with coverage for claims arising from alleged sex trafficking and does not support the proposition for which AFM relies on it.

First, AFM's discussion of these cases omits key facts and subsequent rulings, resulting in an incomplete and misleading argument. AFM, for example, cites to the *Samsung* trial court decision, and even notes that an appeal was docketed, but remarkably fails to inform this Court that the Third Circuit issued a subsequent ruling in that case (more than a year ago), which (1) questioned "whether state public policy can ever abrogate an insurer's duty to defend and indemnify[;]" (2) explained that such a public policy question is "'most appropriate[ly]' left for" the state's highest court; and (3) certified the public policy question for determination by the Pennsylvania Supreme Court. *Samsung Fire & Marine Ins. Co. (U.S. Branch) v. RI Settlement Tr.*, No. 23-1988, 2024 WL 4921644, at *2, 4, 5 (3d Cir. Aug. 12, 2024).

The Third Circuit recognized the competing interests at play including, on one hand, the strong presumption in favor of coverage, including when the alleged harm was not intentional but was arguably reckless; while, on the other hand, also recognizing that the "Pennsylvania legislature criminalizes enabling and knowingly benefitting from sex trafficking[.]" *Id.* at *4 (citing 18 PA. CONS. STAT. § 3011). AFM's failure to inform the Court of this subsequent Third Circuit ruling is telling[17] because the Third Circuit's order obviously calls into question the validity of any other Pennsylvania District Court decisions,[18] which are the only cases AFM identifies on this point.

---

[17] AFM previously made this same mistake in prior briefing, and this Court identified the error in its subsequent ruling. *E.g.*, Wyndham Entities' Opposition to AFM's Motion to Dismiss, Docket No. 94, at 19; Order Denying AFM's Motion to Dismiss, Docket No. 129, at 8-9 (discussing *Samsung* case).

[18] The *Samsung* and *Nautilus* cases also did not involve hotel franchisors, let alone their corporate parents, which is another key difference because, unlike the hotel operators, SWI and Wyndham are not in control of day-to-day operations of the Hotel, would not have had the same level of presence (if any) to witness the alleged evidence of trafficking, and generally are further removed from the alleged conduct. *See* Docket No. 150-1, at 2 (Mueller Decl., ¶ 8).

The Seventh Circuit has recognized that a franchisor's potential liability for alleged trafficking is treated differently from a franchisee's because the franchisor is an additional "step removed" from the sex traffickers. *G.G.*, 76 F.4th at 562 ("The franchisor defendants in that case were one step

Second, the *Samsung* and *Nautilus* cases did not apply <u>Indiana</u> law or purport to set forth any <u>Indiana</u> public policy, which means that none of those cases, even if still good law, could establish AFM's burden to show a "dominant and well-defined" <u>Indiana</u> public policy set forth by <u>Indiana's</u> "[c]onstitution, its statutes, the practice of its officers in the course of administration, and the decisions of its court of last resort" as required by the Indiana Supreme Court to overcome the "'very strong presumption of enforceability' of contracts." *WellPoint*, 29 N.E.3d at 724.

This is a particularly important distinction because, in *Samsung*, the insurer argued, and the Third Circuit concluded, that the "insured's alleged conduct violates Pennsylvania's anti-trafficking law." *Samsung*, 2024 WL 4921644 at *2. But the Pennsylvania trafficking statute is broader than the Indiana trafficking statute such that, in *Samsung*, the insurers argued that the Pennsylvania legislature criminalizes "knowingly benefit[ing] financially … from any act that facilitates [trafficking.]" *E.g.*, 18 PA. CONS. STAT. § 3011(a)(2). The Indiana statute, in contrast, is limited to the conduct of those convicted of directly perpetrating sex trafficking and not even AFM has contended that Wyndham violated any specific Indiana statute. This distinction is critical to the public policy analysis because the Indiana legislature could have, like Pennsylvania, enacted broader criminal statutes, but it chose not to.

<u>Third</u>, AFM's discussion of the *Samsung* and *Nautilus* cases is incomplete in another way. AFM fails to mention the <u>multitude</u> of other decisions, from numerous other jurisdictions (as opposed to a single district court in Pennsylvania), in which courts have consistently and repeatedly ruled that **<u>insurers are obligated to defend hotel operators and/or franchisors against claims asserting civil liability under the TVPRA</u>** (or similar claims). *E.g.*, *Liberty Mut.*

---

removed from the sex traffickers (*i.e.*, street-level trafficker –> hotel –> hotel franchisor).") (discussing *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021)).

*v. Red Roof*, 2025 WL 2685867 (rejecting, *inter alia*, an insurer's public policy arguments and ruling that the insurer was required to defend TVPRA claims against a hotel franchisor); *Starr Indem.*, 2021 WL 2457107 (ruling that insurer was obligated to defend hotel franchisor against TVPRA claims); *Ricchio*, 424 F. Supp. 3d 182 (same for TVPRA claims against hotel operator); *Northfield*, 2024 WL 4224628 (same); *see also Mesa Underwriters Specialty Ins. Co. v. Khamlai Lodging, LLC*, 2022 WL 1135013 (N. D. Ga. 2022) (insurer required to defend negligence and RICO claims against insured hotel arising from sex trafficking allegations); *Travelers Prop. Cas. Co. of Am. v. Salesforce.com, Inc.*, 2021 WL 1376575 (N.D. Cal. 2021) (insurer required to defend underlying sex trafficking claims since underlying claims "could support claim for negligence"), *aff'd,* 2024 WL 4286968 (9th Cir. 2024).

In light of the foregoing, summary judgment should be granted as to AFM's duty to defend and AFM's Motion should be denied.

### 4. SWI Does Not Seek a Defense in the Underlying Action

Next AFM argues that it is entitled to summary judgment on SWI's Counterclaim because no "suit" has been asserted against SWI. AFM's argument misreads and misstates the Counterclaim by asserting that "SPI alleges that [AFM] must defend it in the Underlying Lawsuit and that [AFM] breached its obligations by failing to do so." AFM's Brief, Docket No. 146, at 21. This is simply incorrect. Instead, the Counterclaim carefully distinguishes between the damages alleged and the relief sought by "Wyndham" (defined in the Counterclaim as Wyndham Hotels & Resorts, Inc.) as opposed to the "Wyndham Counterclaimants" (which the Counterclaim defines as "Wyndham and SWI").

The Counterclaim alleges that AFM "is obligated, but has failed to reimburse <u>Wyndham</u> [not SWI] for costs and expenses incurred to investigate and defend the Underlying Lawsuit" and that Wyndham (not SWI) has suffered damages as a result. Docket No. 69, at 43 (Counterclaim,

¶¶ 118, 120, 121) (emphasis added). Count V of the Counterclaim (Declaratory Judgment) also specifically distinguishes between the two entities by alleging that, as a result of the Underlying Action: (1) "Wyndham [not SWI] has incurred, and will incur in the future, substantial defense costs and expenses." *Id.* at 43 (Counterclaim, ¶ 124) (emphasis added); and (2) that "SWI may incur in the future, substantial defense costs and expenses." *Id.* at 44 (Counterclaim, ¶ 125) (emphasis added).

In other words, SWI is merely seeking a declaration that, if SWI incurs costs in connection with the Underlying Suit (for example, if the Suit is amended to name SWI as a defendant), then SWI is also entitled to coverage for all of the same reasons that Wyndham is entitled to coverage and that SWI does not have to re-litigate the same coverage arguments that AFM is raising in this action. AFM's summary judgment argument related to its duty to defend SWI misrepresents the actual claims asserted in the Counterclaim and AFM is not entitled to a declaration on this basis.

### 5.  Punitive Damages Allegations Do Not Extinguish AFM's Duty to Defend

As discussed above, AFM is obligated to defend "mixed" claims and thus as long as some of the claims in the Underlying Complaint are potentially covered, AFM is obligated to defend the entire claim. *Virk Boyz*, 219 F. Supp. 3d at 873 ("[I]f the policy is otherwise applicable, the insurance company is required to defend even though it may not be responsible for all of the damages assessed. … In other words, in for a penny, in for a pound.") (quotation omitted). Thus, even if punitive and exemplary damages are not covered by the Policy (which the Wyndham Entities do not concede), that is irrelevant to determining AFM's duty to defend because the Underlying Complaint indisputably seeks, *inter alia*, covered "compensatory damages" in addition to the "punitive damages" that AFM claims are not covered. Docket No. 150-2, at 46 (Underlying Complaint, ¶ 181). No punitive damages have been assessed, and may never be assessed, against

Wyndham. It is premature and unnecessary to determine this issue prior to the resolution of the Underlying Action.

### C. AFM's Duty to Indemnify

1. <u>Wyndham Is Entitled to Summary Judgment on the Duty to Indemnify Because AFM Has Failed to Set Forth Evidence Supporting Its Claim</u>

This Court should grant summary judgment to Wyndham on AFM's duty to indemnify claim because AFM has failed to set forth evidence to establish the essential elements to AFM's argument, and no such evidence has been developed in this litigation, that AFM "is not required to … indemnify Wyndham in connection with the Underlying Lawsuit." Docket No. 35, at 12 (Amended Complaint, ¶ 50).

There can be "no genuine issue as to any material fact," when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *A.A. v. Warsaw Cmty. Sch. Corp.*, 676 F. Supp. 3d 635, 643 (N.D. Ind. 2023) (quoting *Celotex*, 477 U.S. at 322). "'In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Id.* (quoting *Celotex*, 477 U.S. at 322).

"An insurer bears the burden of proof as to any basis for avoiding coverage." *Thomson Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 994-95 (Ind. Ct. App. 2014) (citations omitted). Because AFM bears the burden of proof on its claim that it owes no duty to indemnify, Wyndham only bears an initial summary judgment burden of showing that AFM's evidence is insufficient to establish an essential element of AFM's claim, after which the burden shifts to AFM to "designate 'specific facts showing that there is a genuine issue for trial.'" *Smith v. Lutheran Univ. Ass'n, Inc.*, 2024 WL 5102869, at *2 (7th Cir. 2024) (quoting *Celotex*, 477 U.S. at 324). AFM must "go beyond the

pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (emphasis added); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986).

Other than insofar as AFM's duty to indemnify argument overlaps with its duty to defend argument, which has been discussed at length above, AFM has developed no facts to support its argument that it has no duty to indemnify, which is an issue for which AFM sued Wyndham and on which AFM bears the burden of proof. Thus, assuming this Court agrees with the Wyndham Entities (and the many other courts that have ruled the same way), that the Underlying Complaint's TVPRA allegations trigger AFM's duty to defend, it necessarily follows that AFM has failed to set forth sufficient facts to establish a genuine issue for trial related to its claim that it owes no duty to indemnify and Wyndham is therefore entitled to summary judgment on this issue.

Although the Wyndham Entities have argued that it would be premature and improper to determine, as AFM requests, that AFM has no duty to indemnify, AFM has disagreed and filed this lawsuit seeking a declaration on this issue, proceeded through discovery, and continues to state that it "will prove that there is no coverage for the Underlying Lawsuit under the Policy and that it has no duty to defend or indemnify Wyndham[.]" AFM's Statement of Claims, Docket No. 120, at 2. AFM has also argued that it "will prove that here, too, the plaintiff in the Underlying Lawsuit was in the care, custody, or control of an insured" and that AFM thus owes no duty to indemnify. *See id.* at 5.

Yet, discovery has now closed, and AFM has failed to create a record to establish the facts it would need to show it has no duty to indemnify. Specifically, AFM has established no evidence whatsoever, beyond what is alleged in the Underlying Complaint, regarding: (1) whether the

alleged trafficking actually occurred; (2) Wyndham's *mens rea*, intent, or knowledge of the alleged trafficking; or (3) whether G.M. was ever in the care, custody, or control of any insured. Instead, the only "evidence" regarding these issues is what is alleged in the Underlying Complaint, which does not create a genuine dispute of fact for a jury to resolve especially since this Court can and should determine that, as a matter of law, the Underlying Complaint at least potentially sets forth covered claims. This failure alone warrants granting summary judgment in favor of Wyndham on AFM's duty to indemnity.

> 2.  In the Alternative, This Court Should Dismiss or Stay the Case with Respect to AFM's Duty to Indemnify

Alternatively, this Court should dismiss or stay AFM's request for declarations that it owes no duty to indemnify consistent with longstanding precedent in the Seventh Circuit.

AFM brings this action under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and exercising jurisdiction under § 2201 is discretionary because a federal district court "is not compelled to declare the rights and relations of the parties." *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 692 (7th Cir. 1995) (citation omitted). Whether a dispute over the duty to indemnify has reached a point at which declaratory judgment is appropriate is a question of federal procedure under the Declaratory Judgment Act. *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003); *see also Cincinnati Ins. Co. v. Maint. Dynamics, Inc.*, 2013 WL 350080, at *3-4 (N.D. Ind. 2013) (turning to the federal Declaratory Judgment Act over the Uniform Indiana Declaratory Judgment Act to adjudicate a duty-to-indemnify dispute and dismissing the indemnity part of insurers' declaratory judgment complaint without prejudice).

Although there are a number of factors that courts consider in determining whether a court should abstain from hearing a declaratory suit on the duty to defend, *e.g.*, *Zavalis*, 52 F.3d at 692 (identifying various factors), the Seventh Circuit has repeatedly explained that courts should

abstain from deciding an insurer's duty to indemnify until the underlying case has been resolved. *E.g.*, *Lear Corp.*, 353 F.3d at 583 ("We regularly say that decisions about indemnity should be postponed until the underlying liability has been established.") (citation omitted); *Am. Bankers Ins. Co. of Fla. v. Shockley*, 3 F.4th 322, 332 (7th Cir. 2021) ("[T]he issue of duty to indemnify is premature until the underlying facts … have been properly adjudicated."); *Zavalis*, 52 F.3d at 693 ("[T]he duty to indemnify is not ripe for adjudication until the insured is in fact held liable in the underlying suit.") (citation omitted); *Grinnell Mutual Reinsurance Co. v. Reinke*, 43 F.3d 1152, 1154 (7th Cir.1995) ("[T]he duty to indemnify is unripe until the insured has been held liable.") (citation omitted); *Travelers Insurance Cos. v. Penda Corp.*, 974 F.2d 823 823, 833 (7th Cir. 1992) ("[T]he determination of whether [defendant] has a duty to indemnify is not ripe until the underlying litigation is terminated.") (citations omitted).

Wyndham denies any liability in the Underlying Action and no liability has been established, which means that Wyndham is not currently seeking, and may never seek, indemnification from AFM. Thus, a determination that AFM has no duty to indemnify at this time is not ripe and would waste the Court's and the parties' resources. *Lear Corp.*, 353 F.3d at 583 ("A declaration that A must indemnify B if X comes to pass has an advisory quality; and if the decision would not strictly be an advisory opinion (anathema under Article III) it could be a mistake, because it would consume judicial time in order to produce a decision that may turn out to be irrelevant.").

Moreover, this Court will not be able to resolve AFM's coverage arguments without first resolving factual questions that would prejudice its own insureds in the Underlying Action. For example, whether Wyndham committed intentional acts (which it did not), had knowledge of the alleged sex trafficking (which it did not), or whether the alleged trafficking even occurred at all,

are all issues that could be dispositive to Wyndham's liability in the Underlying Action and also appear to be issues that AFM proposes to put before a jury based on nothing more than the allegations in the Underlying Complaint.

If a policyholder's entitlement to indemnification from its insurer turns on the nature of the policyholder's conduct in the underlying action—such as whether an injury was factually "expected" or "intended" by the insured and thus excluded from coverage—the actual nature of the insured's conduct is "properly left, in the first instance to the court deciding the underlying lawsuit." *Zavalis*, 52 F.3d at 693; *All-Star Ins. Corp. v. Steel B., Inc.*, 324 F. Supp. 160, 164-65 (N.D. Ind. 1971) ("[T]he Court does not feel obliged to have a trial [to determine fact questions regarding the insured's knowledge and intent] on the question of liability to pay prior to the tort trial in the state court."); *see also Mt. Hawley Ins. Co. v. Lincoln Hotels, LLC, et al.*, 2021 WL 1351858, at *3 (N.D. Ga. 2021) (applying Georgia law) (staying discovery in an insurer's declaratory judgment action until the resolution of the underlying actions because the insurer's discovery was seeking to establish facts regarding, *inter alia*, whether a hotel franchisor knew or should have known about alleged sex trafficking. The court held that allowing the case to proceed could "jeopardize the Hotel Defendants' defense in the [underlying] action" by allowing an insurer to develop facts "which could arguably be detrimental to its own insureds' positions in the underlying lawsuit" and that "[a]t a minimum, this is an ethical dilemma.").

Thus, in the event the Court is not inclined to grant summary judgment to Wyndham on AFM's duty to indemnify claim based on a lack of proof, it is premature to decide that AFM has no duty to indemnify Wyndham until after it is determined whether, to what extent, and on what basis Wyndham might be held liable in the Underlying Action. Indeed, a number of these factual questions will be at issue in the Underlying Action. The Court in the Underlying Action then will

either dismiss the case (mooting AFM's request regarding its duty to indemnify) or make factual findings that will impact an adjudication in this action on AFM's duty to indemnify. In either case, however, the court in the Underlying Action where liability will be adjudicated should make those findings in the first instance. Determining such questions in this action, on an incomplete record, could severely prejudice Wyndham's defense of the Underlying Action.

By filing this action, AFM, which has agreed to participate in Wyndham's defense, jeopardizes that defense by attempting to develop facts "which could arguably be detrimental to [Wyndham's]…positions in the underlying lawsuit," an action one court has categorized as "an ethical dilemma." *Lincoln Hotels*, 2021 WL 1351858, at *3. AFM should not be permitted to place Wyndham in such a position. Therefore, Wyndham's Motion should be granted and AFM's indemnification claim dismissed or stayed.

## IV.    <u>CONCLUSION</u>

The Wyndham Entities respectfully request that this Court: (1) deny AFM's Motion for summary judgment in its entirety; and (2) grant summary judgment to the Wyndham Entities, declaring that: (a) with respect to AFM's duty to defend, AFM has breached its obligation to defend Wyndham and AFM is obligated to reimburse both Wyndham Entities' defense costs in connection with the Underlying Action; and (b) with respect to AFM's duty to indemnify, (i) grant summary judgment in favor of Wyndham or, (ii) in the alternative, dismiss AFM's Amended Complaint (Docket No. 35) without prejudice or stay the issue pending the resolution of the Underlying Action.

Dated:  October 20, 2025

Respectfully submitted,

/s/ *Lara Langeneckert*

**K&L GATES LLP**
Donald W. Kiel (admitted *pro hac vice*)
Erin Fleury (admitted *pro hac vice*)
One Newark Center
Tenth Floor
Newark, NJ 07102-5252
Telephone: (973) 848-4000
Facsimile: (973) 848-4001
Donald.Kiel@klgates.com
Erin.Fleury@klgates.com

**BARNES & THORNBURG LLP**
Charles P. Edwards
Lara Langeneckert
Kelsey Dilday Miller
11 South Meridian Street
Indianapolis, IN 46204
Telephone: (317) 231-7777
Facsimile: (317) 231-7433
charles.edwards@btlaw.com
lara.langeneckert@btlaw.com
kelsey.dildaymiller@btlaw.com

*Attorneys for Defendant/Counterclaim Plaintiff Wyndham Hotels & Resorts, Inc. and Counterclaim Plaintiff Super 8 Worldwide, Inc. (f/k/a Super 8 Motels, Inc.)*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of October, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Lara Langeneckert*
Lara Langeneckert